H. T. Rainwater and Emmy Lou Rainwater, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 41225. Filed December 7, 1954.

*Cyrus A. Neuman, Esq.*, for the petitioners.
*D. Z. Cauble, Jr., Esq.*, for the respondent.

454

OPINION.

RAUM, *Judge:* The principal issue is whether the Commissioner, in computing petitioner's distributive share of income from bookmaking partnerships for the years 1948–1950, was warranted in ignoring the profits or losses shown on the daily summary sheets and determining gross income of the partnerships to be equal to 15 per cent of the gross receipts appearing on those sheets. The Commissioner argues that since the underlying sixty-line sheets had been systematically destroyed, petitioner's books and records were inadequate; and that he was therefore justified in determining income by some other method. He used the 15 per cent figure, because at race tracks 15 per cent of the amounts bet are retained by the track and the remaining 85 per cent divided among the winning bettors. The burden was on the petitioner to prove that the Commissioner was in error, and we think that he has carried that burden in this case.

True, petitioner had destroyed the sixty-line sheets and thus has made the Commissioner's task of auditing the returns immeasurably more difficult than it should be. This is conduct that is not to be condoned. Perhaps the Treasury should seek and the Congress should provide it with appropriate and effective sanctions, civil or criminal or both, against taxpayers who fail to keep or who do away with important records bearing on their liability. But, under the law as it now stands we are not empowered to approve deficiencies merely because records have been destroyed. Of course, the destruction of records is a factor that may be taken into account in various circumstances such as the determination of fraud, and it may justify the Commissioner in using some reasonable method of reconstructing a taxpayer's income, with the burden upon the taxpayer to show that the Commissioner is in error. On the record before us, however, we think that the Commissioner's method was wholly arbitrary as applied in this case, and that petitioner has discharged his burden of proof.

In the case of betting at race tracks it is a matter of indifference to the track as to which horse wins. The track withholds 15 per cent of the total amount bet, and the remaining 85 per cent is divided among the winning bettors. In the case of a bookmaker, such as petitioner, the results of each race are of crucial importance. If he

has received a disproportionate number of bets on a horse that wins, he not only has no profit, but will sustain losses. And the record before us is persuasive that there were many months in which various of the partnerships in fact sustained losses. One of the petitioner's partners, Moncrief, found the operation so unprofitable that he returned to his trade as a plasterer. Another partner, Turner, also terminated his relationship with petitioner for somewhat similar reasons. On one occasion petitioner had to borrow $5,000 in order to pay losses.

The Government attempted to support its position by calling an expert witness who had been the general manager of a syndicate that was a clearing house for from 28 to 55 bookmakers operating handbooks in Miami Beach hotels. This witness testified that the percentage of profit realized by these bookmakers ranged from about 11 per cent during the summer to about 17 per cent during the winter. However, the testimony of this witness, on the whole, was more damaging to the Government than it was helpful. The witness made it clear that skill played an important part in the successful operation of a handbook, and that "greedy" bookmakers, who do not "lay off" when they become overloaded on some horses are likely to lose money. The bookmakers under his jurisdiction were expertly supervised, and when any one of them showed a tendency to lose he was given instruction in the operation of the handbook. The testimony as to petitioner's partnerships indicated that it was not their practice to make "lay offs," and we are left with the distinct impression from the Government's expert witness that the profit experience of his syndicate was not a fair index to use in evaluating the profits of petitioner's partnerships.

There is a final element of pivotal significance in this case, namely, the testimony that the daily summary sheets, upon which the returns were based, were in fact used by petitioner and his partners in arriving at a division of profits each month. We found this testimony credible. Here then was a situation where the partners, dealing with petitioner at arm's length, accepted the figures on the daily summary sheets in their monthly accounting with him. Taking into consideration the entire record, the arbitrary character of respondent's determination, the persuasive evidence that the partnerships in fact sustained many losses, the nature of petitioner's operation, and the fact that the daily summary sheets were themselves used as a basis for division of profits between the partners, we are satisfied that the respondent's determination cannot be sustained. We do not, of course, have any special knowledge or sophistication with respect to the type of activity involved herein. Conceivably, a different result might be

reached on a different record. But on the record before us, which must be used as the basis for decision, it is clear that the Commissioner's determination cannot stand.

The returns as to one of the partnerships, however, do disclose incorrect reporting in one respect, and an adjustment must be made to correct the error. The returns for Turner and Rainwater for the period January 1, 1948, to June 6, 1948, reported "Net winnings" of $2,824, deductions for scratch sheets, forms, wire service, and telephone of $856.60, and a net profit of $1,867.40.[2] However, the testimony was quite plain that in arriving at "Net winnings" the expenses had already been deducted. It is obvious that to allow them again would result in a double deduction. The claimed deductions of $856.60 must therefore be disallowed.

The 5 per cent addition to tax asserted under section 293 (a) of the Internal Revenue Code of 1939 was not justified.

*Decision will be entered under Rule 50.*

---

[2] Apart from the impropriety of taking any such deduction here, there was in any event a mistake in arithmetic since the difference between the "Net winnings" figure and the deductions claimed is $1,967.40.