ESTATE OF MAURICE G. TODISCO, FRAMINGHAM TRUST COMPANY, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Todisco v. Commissioner
Docket No. 9146-76.
United States Tax Court
T.C. Memo 1983-247; 1983 Tax Ct. Memo LEXIS 541; 46 T.C.M. (CCH) 35; T.C.M. (RIA) 83247; May 4, 1983. *541 Chester M. Howe, for the petitioner. Maureen T. O'Brien, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in decedent's income tax and additions to tax: Sec. 6651(a) [1]
Sec. 6653(a)
Tax Year
Deficiency
Addition to Tax
Addition to Tax
1972
$76,136.09
$3,735.15
$3,855.70
1973
24,092.24
3,581.14
Petitioner claims overpayments of $1,348 for 1972 and $218 for 1973. After concessions by the parties, the issues for decision are: (1) the amount of gross income which decedent received in his bookmaking operation; (2) the amount of deductions associated with the bookmaking operation; and (3) whether petitioner is liable for additions to tax as determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and attached exhibits are incorporated herein by reference. Maurice G. Todisco ("Todisco") died on May 28, 1974. Framingham Trust Company is the executor of decedent's estate. The *542 executor maintained its principal office in Massachusetts when it filed the petition in this case. Todisco was an employee and part-owner of The Limelight, a bar and restaurant in Southboro, Massachusetts. Todisco's 1972 and 1973 income tax returns reported the income which he received from The Limelight. From April 1, 1972, to April 14, 1973, Todisco also engaged in the business of bookmaking. He accepted wagers from bettors on sporting events, horse racing and numbers. Todisco operated his book primarily out of a rented apartment where Anthony Pellegrino ("Pellegrino") answered the telephone and noted the wagers when the bettors called. Todisco's 1972 and 1973 income tax returns reported no income from the bookmaking operation. The Massachusetts State Police arrested Todisco for gaming violations on April 14, 1973. The police seized $5,925.25 in cash and a series of betting slips when they arrested Todisco. The police seized $26,000 in cash from Todisco's safe-deposit boxes soon after his arrest. They seized an additional $4,521 from Todisco during November, 1973. Income
The betting slips showed that Todisco's book contained gross wagers of the following amounts on the *543 following days: Date
Gross Wagers
April 2, 1973
$350.84
3
255.75
4
4,509.90
5
11,427.30
6
1,302.00
7
11,647.50
8
10,240.00
9
768.25
10
8,244.25
11
3,067.75
12
5,049.00
13
9,093.50
Copies of the April 13, 1973, slips appear in the record. Copies of the slips for the period from April 2, 1973, to April 12, 1973, were not available at the time of trial. On April 13, 1973, Todisco's book won $4,690.25 and lost $4,140. In other words, the bettors had to pay Todisco $4,690.25 and Todisco had to pay his customers $4,140 as a result of the wagers made that day. Accordingly, Todisco made a gross profit of $550.25 on gross wagers of $9,093.50. Thus, Todisco's gross profit percentage for April 13, 1973, was 6.1 percent of gross wagers. The April 13, 1973, betting was distributed among sports, horses and numbers in the following way: [2]
Todisco's Gross
Gross Bets
Bettor Lost
Bettor Won
Profit (Loss)
Basketball
$7,450.00
$4,065.00
$3,125.00
$940.00 Baseball
330.00
225.00
75.00
150.00 Horses
* *544 350.00
857.00
(507.00)
Numbers
*
50.25
83.00
(32.75)
Total
$9,093.50
$4,690.25
$4,140.00
$550.25  Todisco's gross profit on the April 13, 1973, basketball and baseball wagers was 12.6 percent and 45 percent of gross wagers, respectively. Todisco suffered losses on the April 13, 1973, horses and numbers wagers. Todisco did not keep a balanced book on April 13, 1973. In other words, Todisco's April 13, 1973, book did not contain wagers from bettors with equal amounts at risk on each side of each sporting event or on each horse for each race. For example, on the Boston - Atlanta basketball game played April 13, 1973, the book had $2,885 in gross wagers favoring the Celtics while it had only $1,100 in gross wagers favoring the Hawks. In effect, Todisco wagered against the Celtics in the amount of $1,785 by accepting the full $2,885 favoring Boston. In a similar way, Todisco risked his own money on many of the wagers he accepted because he did not keep a balanced book. However, when Todisco had a large amount of his own money at risk he would find another bookmaker who would place a balancing bet *545 in Todisco's book which would soak up some or all of the unwanted risk. The betting on the April 13 Boston - Atlanta basketball game provides an example of this type of risk management. All of Todisco's customers bet on the Celtics. Todisco, not wanting to accept the entire risk of the $2,885 bet on the Celtics, found another bookmaker who was willing to bet $1,100 on Atlanta in Todisco's book. Thus Todisco eliminated his risk on $1,000 of the Celtics bets but remained fully at risk on the remaining $1,785 of the Celtics bets. The level of betting in Todisco's book varied widely from day to day. The following table charts the gross wagers and sporting events from April 2, 1973, through April 13, 1973: Day
Sporting Events
Gross Bets
April 2, 1973
No games
$350.84
(Monday)
April 3, 1973
No playoff games
255.75
(Tuesday)
April 4, 1973
NBA [3] playoff games
4,509.90
(Wednesday)
Boston vs. Atlanta
New York vs. Baltimore
NHL [4] playoff games
New York vs. Boston
St. Louis vs. Chicago
Buffalo vs. Montreal
Minnesota vs. Philadelphia
April 5, 1973
NBA playoff game
11,427.30
(Thursday)
Milwaukee vs. Golden State
NHL playoff games
New York vs. Boston
St. Louis vs. Chicago
Buffalo vs. Montreal
Minnesota vs. Philadelphia
Baseball
San Francisco vs. Cincinnati
(Season's First Game)
April 6, 1973
NBA playoff games
1,302.00
(Friday)
Atlanta vs. Boston
New York vs. Baltimore
Los Angeles vs. Chicago
Baseball
All teams
(Opening Day)
April 7, 1973
NBA playoff game
11,647.50
(Saturday)
Milwaukee vs. Golden State
NHL playoff games
Boston vs. New York
Chicago vs. St. Louis
Montreal vs. Buffalo
Philadelphia vs. Minnesota
Baseball
All teams
April 8, 1973
NBA playoff games
10,240.00
(Sunday)
Boston vs. Atlanta
Baltimore vs. New York
Golden State vs. Milwaukee
Los Angeles vs. Chicago
NHL playoff games
Boston vs. New York
Philadelphia vs. Minnesota
Baseball
All teams
April 9, 1973
NBA & NHL
768.25
(Monday)
No games
Baseball
Only four games
April 10, 1973
NBA playoff games
8,244.25
(Tuesday)
Golden State vs. Milwaukee
Chicago vs. Los Angeles
NHL playoff games
New York vs. Boston
St. Louis vs. Chicago
Buffalo vs. Montreal
Minnesota vs. Philadelphia
Baseball
All teams
April 11, 1973
NBA playoff game
3,067.75
(Wednesday)
Atlanta vs. Boston
NHL
No teams
Baseball
All teams
April 12, 1973
NBA
5,049.00
(Thursday)
No games
NHL playoff games
Montreal vs. Buffalo
Philadelphia vs. Minnesota
New York vs. Chicago
Baseball
All teams
April 13, 1973
NBA playoff games
9,093.50
(Friday)
Boston vs. Atlanta
Los Angeles vs. Chicago
Milwaukee vs. Golden State
NHL playoff game
New York vs. Chicago
Baseball
All teams
*546 Expenses
Todisco incurred the following expenses in his bookmaking operation: Rent
$250 per month
Telephone
$250 per month
Wages to Pellegrino
$150 per week
The State of Massachusetts made a $31,925.25 assessment against Todisco on or about April 17, 1973, for state income taxes allegedly due on the income earned from the bookmaking operation. On or about November 27, 1973, the State of Massachusetts made a further $4,521 assessment against Todisco for additional state income taxes allegedly due on his bookmaking income. The Massachusetts authorities apparently applied the $36,446.25 amount seized from Todisco in 1973 to satisfy the $36,446.25 in assessments. None of the $36,446.25 seized and assessed by Massachusetts has been repaid to Todisco or to his estate. The respondent made a $49,467.04 assessment against Todisco on May 17, 1973, for the Federal wagering excise tax allegedly due from Todisco's bookmaking operation. None of the $49,467.04 assessment was collected in 1973. Todisco's Lifestyle
During the years in issue Todisco's major assets were a house, a *547 1971 Cadillac, interests in The Limelight, a diamond ring and a gold chain. Todisco's house cost $12,000. He acquired it with the minimum down payment possible ($1,000) and obtained a mortgage for the remainder. Todisco obtained a $6,000 loan in order to purchase the Cadillac. Todisco paid no cash to acquire his interests in The Limelight because such purchases were fully financed by loans. Todisco's debts during the years in issue included the following: Balance
Monthly
Term Date
Creditor
Balance
Date
Payments
of Note
Workingmen's
$11,109.49
December 31, 1971
$175
**
Cooperative Bank
First National
$ 6,084.00
February 1, 1971
Interest
February 1, 1974
Bank of Natick
Only
Suburban Credit
$ 6,000.00
November 5, 1971
$186.66
October 5, 1974
Union
General Finance
$ 4,000.00
June 11, 1971
$366.72
June 11, 1972
General Finance
$ 4,000.00
July 14, 1972
$366.72
July 14, 1973
Todisco did not go on expensive vacations during the years in issue. He occasionally took his wife and children to Maine for a weekend. The longest vacation he took was three days. Todisco occasionally entertained his friends by renting a hotel suite for card games and socializing. Additions to Tax
Todisco *548 filed his 1972 Federal income tax return on June 18, 1973. On or about April 11, 1974, the executor filed an application for an automatic extension of time within which to file Todisco's 1973 individual income tax return. This extension allowed the executor to file the return on or before June 15, 1974. Section 1.6081-4, Income Tax Regs. The executor did not apply for further extensions. The executor filed Todisco's 1973 return on August 27, 1974. OPINION The respondent determined that Todisco had unreported bookmaking income for 1972 and 1973 in the following amounts: 1972
$128,614.28
1973
49,467.03
Respondent's Methodology
In determining the amount of Todisco's unreported income from bookmaking the respondent examined the book's gross wagers from Monday, April 3, 1973, through Friday, April 13, 1973. The gross wagers for the period totaled $65,956.04. Respondent treated this sum as reflecting two full weeks of operation. Accordingly, respondent determined that the average level of weekly wagers was $32,978.02. The parties stipulated that Todisco was in the business of bookmaking from April 1, 1972, to April 14, 1973. This period covered 39 weeks in 1972 and 15 weeks in 1973. *549 The respondent multiplied the $32,978.02 average weekly wager figure by the number of weeks during which Todisco operated his book to determine the following gross bets received for 1972 and 1973: 1972
$1,286,142.78
1973
494,670.30
Based on an examination of the betting slips from April 2, 1973, through April 13, 1973, respondent determined that Todisco's gross profit was 10 percent of gross wagers. Accordingly, the respondent determined that Todisco's gross income from bookmaking was $128,614.28 in 1972, and $49,467.03 in 1973. Respondent allowed no deductions in computing Todisco's taxable income from bookmaking. Burden of Proof
Petitioner argues that respondent's determination was arbitrary and excessive, thus placing the burden of proof on respondent. See Helvering v. Taylor,293 U.S. 507 (1935). Petitioner cites Carson v. United States,560 F.2d 693 (5th Cir. 1977), and Pizzarello v. United States,408 F.2d 579 (2d Cir. 1969), to support his argument that respondent's determination is arbitrary and excessive. In those cases the government determined that the taxpayers had unreported income from gambling for several years. The government based its determination on only a few days *550 of seized records which related to only one of the years in issue. The court in Carson and Pizzarello held that such determinations were excessive and arbitrary to the extent that they determined that the taxpayer had unreported gambling income in the years for which there was no evidence that the taxpayer was involved in gambling. However, the court in Carson held that the determination was not excessive or arbitrary as it applied to the years during which the taxpayer was involved in gambling. In this case the parties stipulated that Todisco operated as a bookmaker during the period to which respondent's determination relates. Thus the principles articulated in Pizzarello are inapposite in this case. Instead, this case presents a situation similar to the years in the Carson case for which evidence existed which linked the taxpayer to gambling activities. Accordingly, we hold that Pizzarello and Carson do not require that respondent's determination in this case be found to be arbitrary and excessive. Petitioner next argues that respondent's determination is arbitrary and excessive because respondent used an erroneous method to calculate Todisco's unreported bookmaking income. *551 However, the respondent need not compute a taxpayer's income with mathematical exactness in situations, such as this case, where the taxpayer failed to maintain or produce records of the bookmaking activities. Estimates based on a reasonable review of available information are sufficient to maintain the presumption of correctness for respondent's determination. Gordon v. Commissioner,63 T.C. 51, 72-74 (1974), supplemental opinion 63 T.C. 501 (1974), affd. on this issue 572 F.2d 193 (9th Cir. 1977), and cases cited therein. Respondent used a reasonable approach for computing Todisco's unreported income. He estimated Todisco's gross profit percentage and weekly gross wagers based on the few days of betting slips which were available to him. He extrapolated these figures to calculate Todisco's income for the entire period during which Todisco operated the bookmaking business.We have approved this approach as a reasonable method for calculating unreported bookmaking income many times before.See Gordon v. Commissioner,supra, and cases cited therein. Nothing in the record of this case changes our position that respondent may use this approach. Petitioner further argues that respondent's *552 estimates of Todisco's profit percentage and the level of average weekly gross wagers renders the determination arbitrary and unreasonable because they are based on an erroneous analysis of the betting slips.As we will subsequently discuss, we do not completely agree with the reasons supporting respondent's estimates. Yet we do not think that such errors require shifting the burden of proof to the respondent. Instead, we think that respondent's analysis represented a good faith effort to interpret the only records available. Todisco created the inaccuracy in this case because he did not maintain adequate records. Accordingly, we think that petitioner should bear the burden of proof. Also, we note that we have previously held that 30 percent is not an unreasonably high choice as a bookie's profit percentage. See Grasavage v. Commissioner,T.C. Memo. 1979-89. Accordingly, we think that respondent's choice of 10 percent as Todisco's profit percentage and $32,978.02 as Todisco's average weekly gross wagers do not make respondent's determination arbitrary and excessive. Finally, petitioner argues that respondent's failure to include deductible business expenses in the calculation of *553 bookmaking income makes the determination arbitrary. We disagree. Respondent's refusal to allow expense deductions does not render the determination excessive or unreasonable in cases such as this case where no records or other substantiation for such expenses were offered to the respondent during the administrative process. Estate of Mason v. Commissioner,64 T.C. 651 (1975), affd. per order 566 F.2d (6th Cir. 1977). Petitioner provided neither us nor the respondent with such records.Therefore, we hold that respondent's determination is not arbitrary or excessive. Accordingly, petitioner has the burden of proof on the unreported income issue. Determination of Todisco's Unreported Income
Petitioner challenges respondent's computation of Todisco's unreported income on several grounds. In particular, petitioner contends that respondent's choice of 10 percent as a profit percentage is wrong, that respondent's use of the gross wagers made from the April 2, 1973, to April 13, 1973, period as a baseline is erroneous and that Todisco had certain expenses which should be deducted in calculating taxable income. We will consider these challenges separately. Petitioner has the burden of *554 proof on this issue. Yet petitioner failed to produce adequate records of Todisco's bookmaking income. Nevertheless, we do not automatically accept respondent's determination. Instead, we must analyze the information which appears in the record to determine as best we can the amount of Todisco's bookmaking income. Gordon v. Commissioner,supra.We will use the profit percentage and average weekly wagers approach for determining Todisco's unreported income. This method provides an adequate approach to the problem and is based on the only records available in this case, the April 2-13, 1973, betting slips. Choice of 10 percent as Todisco's profit percentage
Respondent chose 10 percent as Todisco's profit percentage based on a review of the betting slips. Respondent noted that for basketball bets Todisco generally required a better to bet $55 to win $50 (or $110 to win $100, etc.). For example, if a bettor bet $55 to win $50 on Boston in its game against Atlanta and Atlanta won, then the bettor owed Todisco $55. If Boston won then Todisco owed the bettor $50. A similar system apparently was used for baseball and hockey. Respondent concluded, based on his review, that Todisco *555 had a 10 percent profit margin built into his book. Accordingly, the respondent determined that Todisco made, as profit, 10 percent of all gross wagers. Petitioner contends that respondent is wrong. He insists that Todisco's profit was only 4.5 percent of gross wagers. Petitioner's calculation is also based on the fact that Todisco generally required the bettors on sporting events to bet 10 percent more than they would receive if they won. However, petitioner's argument is based on the assumption that Todisco maintained a balanced book in which he had two bettors betting equal amounts on the opposing teams in a sports match. For example, in the Boston - Atlanta game, petitioner assumes that Todisco had two bettors betting $55 to win $50, one betting on Boston and the other betting on Atlanta. Whichever team won, the losing bettor would pay Todisco $55 and Todisco would pay the winning bettor $50. Thus, Todisco would retain $5 as profit, which constitutes 4.5 percent of the total gross bets of $110. This $5 profit is known as "vigorish" or "juice." Petitioner, therefore, argues that Todisco had a built in profit of 4.5 percent, and that he received no more or less than that amount. *556 Both petitioner and respondent are incorrect. Todisco's books were not balanced. Our review of the April 13, 1973, betting slips shows instead that Todisco took betting positions in his book: each bet for a team was not necessarily offset by other bets for the opposing team. Todisco's profit would rise and fall depending on who won the respective sporting events because he had much of his own money in a betting position. Accordingly, we conclude that it is impossible to calculate Todisco's profit as an exact percentage of gross wagers. Our conclusion is supported by the results of the betting on April 13, 1973. Todisco made a profit on basketball and baseball but lost money on the horses and numbers that day. Despite profits of 12.6 percent and 45 percent on basketball and baseball respectively, Todisco's overall profit was only 6.1 percent due to the losses on the horses and numbers. In sum, Todisco would make money on some days as to some events and lose as to others; he would win money, overall, some days and lose money, overall, on other days. Over the long run we are convinced that Todisco made gross profits, otherwise he would not have stayed in business. But it is impossible, *557 without adequate records, to know what his exact profit percentage was. However, we must estimate Todisco's profit percentage as best we can given the record. After careful consideration of all the facts in the record, with particular emphasis on the spread of profit percentages among the events on April 13, 1973, we find that Todisco's profit percentage was 8 percent. Average Weekly Wagers
Respondent determined that Todisco accepted average weekly wagers of about $32,978.02. Respondent based his determination solely on the April 2, 1973, to April 13, 1973, slips which were seized at the time of Todisco's arrest. We note that respondent's determination is generous because it calculated a weekly average using only six days of bets when Todisco apparently operated his book seven days a week. Petitioner makes two arguments to support its position that respondent's $32,978.02 figure is too high: (1) respondent's figure is based on the April 2, 1973, to April 13, 1973, period which experienced an abnormally high level of betting due to the appearance of Boston teams in the hockey and basketball playoffs; and (2) Todisco's use of balancing bets inflated the level of average weekly *558 gross wagers during busy times such as the playoff period.We will review these arguments separately before stating our conclusion concerning the level of average weekly wagers in Todisco's book. Impact of the Playoffs
Petitioner argues that the April 2, 1973, to April 13, 1973, period had an abnormally high amount of betting. Todisco's employee, Pellegrino, testified that betting always increased at playoff times, particularly when local Boston teams were involved. The April 2, 1973, to April 13, 1973, period had both NBA and NHL playoffs. Also, Boston teams were involved in both playoffs. Pellegrino testified that the betting averaged about $2,000 in gross bets per week during non-playoff periods.
We are satisfied that the betting level from April 2, 1973, to April 13, 1973, was abnormally high due to the playoffs. Our findings of fact show that betting was substantially lower on the days that no Boston teams were playing than on days when either or both were playing. Therefore, the weekly averages derived from the April 2, 1973, to April 13, 1973, period are not representative of the entire 54-week period during which Todisco operated his book during the years in issue. Accordingly, *559 respondent's $32,978.02 figure for average weekly wagers is too high. Petitioner asks us to adopt Pellegrino's testimony and find that the average weekly wager level was $2,000 per week. However, evidence provided by the Massachusetts State Police officer who arrested Todisco shows that Todisco's book contained a significant level of betting at times other than the April 2, 1973, to April 13, 1973, period. The officer testified that Todisco accepted hockey and basketball bets totaling several thousands of dollars on several days in December, 1972. For example, Todisco accepted a $2,530 bet to win $2,300 on a December 26, 1972, game. This period was not the playoff season for those sports. This testimony taken together with the other evidence in the case convince us that Pellegrino's estimate of a $2,000 per week average is too low. Impact of Balancing Bets
During periods such as the April 2, 1973, to April 13, 1973, playoff period, in which betting exceeded its normal levels, Todisco obtained balancing bets from other bookmakers to lower his risk. Petitioner argues that Todisco's practice of getting balancing bets doubled the gross wagers received during the April 2, 1973, *560 to April 13, 1973, period. Thus, petitioner contends, the wagering level during that period and respondent's estimate of average weekly wagers were greatly inflated above normal levels because of local interest in the playoffs and because Todisco had to take steps to manage the increased risk caused by the playoffs. We do not think that the balancing bets alone caused the wagering level to double during the April 2, 1973, to April 13, 1973, period. The betting level would double due to the balancing bets only if Todisco matched every but on his book with an equal and opposite balancing bet. Todisco did not follow this strategy on April 13, 1973. As discussed previously, Todisco did not keep a balanced book. He maintained a betting position with respect to most of the wagers on his book. Accordingly, Todisco's practice of hedging risk by obtaining balancing bets was not so extensive as to double the level of wagering. Also, Pellegrino identified only $3,098 of the $9,093.50 of gross wagers on April 13, 1973, as balancing bets. The April 13, 1973, betting slips demonstrate that Todisco did not keep a balanced book and that the balancing bets did not themselves double the wagering *561 level. For example, for the Milwaukee - Golden State basketball game Todisco's customers bet $650 to win $600 on Golden State. No one bet on Milwaukee. Todisco got another bookmaker to bet $1,100 to win $1,000 on Milwaukee in Todisco's book. Pellegrino called this $1,100 bet a balancing bet even though it created a new risk (Todisco would lose if Milwaukee beat the spread) while it eliminated another risk (Todisco would no longer lose if Golden State beat the spread). The other large balancing bet on April 13, 1973, occurred with reference to the Boston - Atlanta basketball game. Todisco's customers bet $2,885 to win $2,675 on Boston. None of Todisco's customers bet on Atlanta. Todisco got another bookmaker to bet $1,100 in Todisco's book on Atlanta. This balancing bet lowered, but did not eliminate, Todisco's risk that Boston would beat the spread. These examples of balancing bets indicate that Todisco did not simply cover all of the bets in his book by securing equal and opposite balancing bets. Accordingly, we cannot conclude that Todisco's balancing doubled the level of wagering activity. Given Todisco's penchant for operating an unbalanced book it is impossible, without *562 adequate records, to ascertain accurately the increased level of wagering activity due to the balancing bets. However, we find that Todisco made balancing bets to trim his risk during periods such as April 2, 1973, to April 13, 1973, when the level of betting was relatively high. This practice would increase the amount of gross bets on Todisco's book although it would not double the wagering level. In sum, we conclude that the level of betting during the April 2, 1973, to April 13, 1973, period was higher than normal because of local interest in the playoff games and because Todisco had to take steps to manage the increased risk present in his book for the period. Based on our careful review of all the evidence in the record, and bearing heavily against petitioner who has the burden of proof in this case, we hold that Todisco had average gross bets of $15,000 per week during the 54 weeks he operated his book. Gross Profit
Our conclusions concerning Todisco's profit percentage and weekly average gross bets mean that Todisco had the following amounts of gross profits from bookmaking in 1972 and 1973: 1972
$46,800
1973
$18,000
Todisco's Lifestyle
Petitioner argues that Todisco's modest *563 style of life and his extensive debt liabilities indicate that Todisco made little, if any, money from his bookmaking operation. Evidence concerning style of life and loans are relevant factors in determining the extent of unreported income. See, e.g., Guzzetta v. Commissioner,T.C. Memo. 1982-560; Jacoby v. Commissioner,T.C. Memo. 1970-244. Fititioner also relies on Pellegrino's testimony that "if Todisco made $50 a day he was happy" to support its argument that Todisco made very little money from the bookmaking operation. The fact that Todisco did not live extravagantly and that his major assets were largely or wholly acquired with borrowed funds tends to indicate that the bookmaking operation did not make him a rich man. Other evidence indicates that the bookmaking operation generated a significant amount of money for Todisco.For instance, the police seized $36,446.25 from Todisco during 1973. Petitioner argues that the cash horde was a necessary cushion in the bookmaking business. Bookmakers like Todisco, who do not maintain a balanced book, need a significant "bankroll" to cover times when they must pay out more than they take in. Respondent's expert witness testified that *564 bookmakers generally need access to a bankroll which is about three times the level of average weekly gross wagers. Accordingly, the large size of the bankroll convinces us that Todisco ran a sizable bookmaking operation which certainly exceeded $10,000 of gross wagers per week and which generated significant income for Todisco. In addition, Todisco's operating costs exceeded $1,000 a month. Todisco must have had a significant operation to justify renting an apartment at $250 per month and hiring a full-time employee at $150 per week.Also, Todisco maintained a smart appearance and entertained his friends occasionally. Taken together, these facts indicate that Todisco operated a successful, moderately sized bookmaking business. Accordingly, we give little or no weight to Pellegrino's testimony which implies that Todisco made less than $50 a day. We think that Todisco would have been happy to earn, and did in fact earn, more than $50 a day from his bookmaking operation. Based on the record as a whole, the evidence concerning Todisco's lifestyle supports our conclusions concerning average weekly wagers and profit percentage. Expenses
Pellegrino testified that Todisco had the following *565 expenses in operating his book: rentals of $250 per month; telephone bills of $200 to $300 per month; Pellegrino's wages of $150 per week; and miscellaneous amounts for purchasing the racing forms, betting slips, etc. Pellegrino's testimony on these matters was forthright and credible. Accordingly, we find that Todisco incurred the following expenses related to his bookmaking operation: Rent
$250 per month
Telephone
$250 per month
Wages
$150 per week However, no deduction for amounts incurred in purchasing racing forms, betting slips, etc., can be allowed because nothing in the record indicates the amount of such expenditures. Section 164 Deductions
Petitioner also contends that it is entitled to section 164 deductions in 1973 for the $36,446.25 amount seized and assessed by Massachusetts and for the $49,467.04 amount assessed by the Federal government during that year. Petitioner argues that such deductions eliminate all tax liability for 1973, and through a section 172 carryback, all tax liability for 1972.
A taxpayer may deduct state income taxes and Federal excise taxes when paid or accrued, depending on his method of tax accounting. Section 164. So long as it clearly reflected *566 income, Todisco could have been either a cash or an accrual basis taxpayer with reference to his bookmaking income by regularly using the method of his choice in computing his bookmaking income on his books and tax returns. Section 446. Todisco kept no books nor did he report any of the bookmaking income. In this situation the respondent can compute Todisco's taxable income under the method which, in respondent's opinion clearly reflects the bookmaking income. Section 446(b).
Accrual method accounting includes income in gross income "when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Section 1.451-1(a), Income Tax Regs. Cash method accounting includes income in gross income when income is actually or constructively received. Section 1.451-1(a), Income Tax Regs.
Respondent's deficiency determination placed Todisco on the cash basis with reference to the bookmaking income. In the deficiency notice respondent determined that: It is determined that, during the year 1972, you received wagering income of $128,614.28 that was not reported on your income tax return. Accordingly, your taxable *567 income is increased $128,614.28. It is determined that, during the year 1973, you received wagering income of $49,467.03 that was not reported on your income tax return. Accordingly, your taxable income is increased $49,467.03. These references to amounts of gambling income "received" during 1972 and 1973 indicate that respondent placed Todisco on the cash basis rather than on the accrual basis.
Cash basis taxpayers, as a general rule, take deductions in the year in which paid. Sec. 1.461-1(a)(1), Income Tax Regs. Therefore we must determine whether Todisco paid Massachusetts state income taxes or Federal wagering excise taxes in 1973. There is no evidence in the record that any part of the $49,467.04 amount assessed by the Federal government for wagering excise taxes was paid in 1973. Accordingly, petitioner is entitled to no section 164 deductions on account of this liability for 1973. The situation concerning the Massachusetts State income taxes is more complex. The Massachusetts State Police seized $31,925.25 from Todisco during April, 1973. Within a week of the seizure, the Massachusetts Department of Corporations and Taxation made a $31,925.25 assessment against Todisco *568 for state income taxes due on his bookmaking income. The state police seized $4,521 from Todisco during November, 1973. Shortly after this second seizure, the Department of Corporations and Taxation made a $4,521 assessment aginst Todisco for state income taxes due on his bookmaking income. No part of the seized amounts was repaid to Todisco or his estate. Petitioner argues that the seizure and assessment constitute payment of $36,446.25 in state income taxes during 1973. Respondent contends that the record contains no evidence that the seized amounts were turned over to the state revenue authorities as a payment of Todisco's tax liabilities. We agree with petitioner.The facts show that the state revenue authorities knew of the seized amounts because they made assessments immediately after the seizures in the same amounts as the amounts seized. The record thus indicates that the two parts of the state government were coordinated. Furthermore, the identity in the amounts seized and assessed implies that the revenue agency intended to use the seized amounts to satisfy Todisco's income tax liabilities. The fact that none of the seized amounts were returned to Todisco or his estate *569 suggests that the revenue agency in fact obtained the seized amounts for this purpose. Respondent maintains that the seized amounts were retained solely as evidence to be used against Todisco in his criminal trial. We accord this argument no weight because the money was not returned to Todisco's estate after Todisco's death on May 28, 1974. Respondent further argues that petitioner's failure to claim a section 164 deduction for the seized amounts on Todisco's 1973 tax return indicates that these amounts were not used to pay Todisco's state tax liability. This argument is inapposite. The petitioner reported no bookmaking income nor claimed any bookmaking deductions on the 1973 return. But petitioner redflagged the problem of unreported bookmaking income on the return. These facts indicate that petitioner intended to have the tax liability from the bookmaking operation treated in a comprehensive fashion in administrative proceedings with the respondent. Accordingly, we think that no weight should attach to petitioner's failure to claim section 164 deductions for the seized amounts on the 1973 return. Our careful consideration of the record indicates that it is more likely than *570 not that the seized amounts went to the state revenue agency to satisfy Todisco's state income tax liability. Accordingly, we hold that the seizure and assessment of $36,446.25 constitutes payment of state income taxes during 1973. Therefore, petitioner satisfied the section 164 requirements for a $36,446.25 state income taxes deduction for 1973. Todisco's 1973 bookmaking deductions (the $36,446.25 of section 164 deduction plus the section 162 business expense deductions) exceed Todisco's 1973 bookmaking income of $18,000. Accordingly, we must decide whether petitioner (1) is entitled to deduct the excess 1973 bookmaking deductions against Todisco's 1973 nonbookmaking income; and (2) is entitled to carryback the excess 1973 bookmaking deductions to offset Todisco's tax liability for previous years.
Section 165(d) states: WAGERING LOSSES. -- Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions. Prior case law indicates that section 165(d) disallows Todisco's 1973 bookmaking deductions to the extent that they exceed his 1973 bookmaking income. In Offutt v. Commissioner,16 T.C. 1214 (1951), the taxpayer was a bookmaker and professional *571 gambler. He incurred mailing, printing and stenographic expenses in operating his book. The taxpayer's net profit from his bookmaking and betting business was $36,442.67 in 1946. In 1947, the taxpayer suffered a net loss of $12,180.10 from this business. The taxpayer reported interest and farm income for 1947 in addition to his net gambling losses. The question in Offutt, as in this case, was whether the taxpayer could deduct the amount of his net losses from his bookmaking and betting business (which included the mailing, printing and stenographic expenses) against 1947 income from other sources and against the income of prior years. We held in Offutt that the predecessor to section 165(d) disallowed the bookmaking and betting deductions in excess of the bookmaking and betting income. Accordingly, we held that the taxpayer was not entitled to offset his nongambling income for 1947 or his prior year's income with his 1947 net losses from bookmaking and betting. See also Skeeles v. United States,95 F. Supp. 242 (Ct. Cl. 1951). [5]
The *572 case currently before us is on all-fours with Offutt. Todisco had a net loss in 1973 from his bookmaking business after including his business expenses and state income taxes paid that year. Because section 165(d) disallows deductions for such net losses, petitioner cannot offset Todisco's nonbookmaking income for 1973 with Todisco's excess business expenses and tax payments from the bookmaking business. Also, the section 165(d) limitation means that petitioner has no "excess of the deductions allowed by this chapter over the gross income" for 1973, and thus has no net operating loss to be carried back from 1973. Section 172(c). Section 6651(a) Additions to Tax
Respondent asserted the section 6651(a) addition to tax for 1972 and 1973. Section 6651(a) provides that an addition to tax shall be imposed in the case of failure to file a timely return, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. If a taxpayer exercises ordinary business care and prudence and is nevertheless unable to file a return within the prescribed time, then the delay is due to reasonable cause. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioner bears *573 the burden of proof on this issue. Fischer v. Commissioner,50 T.C. 164, 177 (1968). Todisco filed his 1972 income tax return on June 18, 1973. Petitioner presented no evidence to excuse this late filing. Accordingly, petitioner is liable for a section 6651(a) addition to tax for 1972. On or about April 11, 1974, the executor filed an application for an automatic extension of time within which to file Todisco's 1973 individual income tax return. This extension allowed the executor to file the return on or before June 15, 1974. Sec. 1.6081-4, Income Tax Regs. The executor did not apply for further extensions. The executor filed Todisco's 1973 return on August 27, 1974. The parties stipulated the following joint exhibit with reference to the late filing issue. AFFIDAVIT
I, Fred G. Pastore, being under oath hereby depose and state that I am have been a certified public accountant since August 1947 and authorized to practice before the Treasury Department. I was employed by the executor of the Estate of Maurice Todisco to prepare the income tax return for the decedent for the year 1973. I was unable to complete the return because of the unavailability of data relating to gambling *574 activities. I noted on the return that the return was incomplete. I had earlier obtained an extension of time in which to file but eventually concluded that the information was unavailable and the return was prepared and filed as soon after I came to that conclusion as was possible. The delay incurred in filing was attributable to the unique circumstances and not to any fault on the part of the executor or myself. Subscribed and sworn to under the pains and penaltites of perjury this 24 day of February, 1982. /s/ Fred G. Pastore Petitioner provided no specifics why it was unable to determine by June 15, 1974, that the records were unavailable and that it could not file the return by that time. We do not think that the affidavit provides adequate evidence that petitioner exercised ordinary business care and prudence in attempting to file a timely return. See Blum v. Commissioner,5 T.C. 702, 712 (1945); Beran v. Commissioner,T.C. Memo. 1980-119. Accordingly, petitioner is liable for a section 6651(a) addition to tax for 1973. Section 6653(a) Addition to Tax
Petitioner also bears the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Petitioner introduced *575 no evidence on this issue. Accordingly, petitioner is liable for a secton 6653(a) addition to tax for 1972. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. There was no betting on the sole hockey game played April 13, 1973.↩
*. The slips do not reveal the amount bet on horses and numbers. However, the amount bet on horses and↩ numbers must have totaled $1,313.50 because the parties stipulated that the gross bets for basketball and baseball constituted $7,780 of the total gross bets of $9,093.50.
3. NBA is an abbreviation for the National Basketball Association. ↩
4. NHL is an abbreviation for the National Hockey League.↩
**. Balance discharged on December 23, 1974.↩
5. Because we are not currently considering the definition of gross income in gambling contexts, we do not have to apply the holding in Winkler v. United States,230 F.2d 766, 775-776↩ (1st Cir. 1956).