ESTATE OF Maurice G. TODISCO,
Framingham Trust Company,
Executor, Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent,
Appellee.

No. 84–1494.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1984.

Decided March 13, 1985.

Chester M. Howe, Boston, Mass., with whom Gaston Snow & Ely Bartlett, Boston, Mass., was on brief for petitioner, appellant.

Bruce R. Ellisen, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., were on brief for respondent, appellee.

Before CAMPBELL, Chief Judge, McGOWAN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal by the estate of Maurice G. Todisco, through the Framingham Trust Company, its executor, from a decision of the United States Tax Court that there was a deficiency in Todisco's income tax for the taxable year 1972 of $14,598 plus interest and penalties for negligent underpayment and failure to timely file a return, and that there was no deficiency or overpayment for the taxable year 1973. *Estate of Todisco v. Commissioner*, 46 T.C.M. (CCH) 35 (1983).

## I. FACTS

Maurice G. Todisco was part owner and an employee of a bar. His 1972 and 1973 federal income tax returns reported income earned from the bar but not from a bookmaking business which he also conducted.

Todisco ran the bookmaking operation from April 1, 1972 to April 14, 1973. Todisco accepted wagers on sporting events, horseracing and numbers. He employed one Anthony Pellegrino to answer the telephone and record wagers. Pellegrino was the principal witness for the Estate at the trial.

On April 14, 1973, the Massachusetts State Police arrested Todisco for gaming violations. The police seized $5,925.25 in cash at the time of Todisco's arrest, $26,-000 in cash from Todisco's safety deposit boxes soon thereafter, and $4,521 from Todisco the following November. Those sums, totalling $36,446.25, were applied in toto to satisfy assessments in like amount against Todisco for state income taxes due on Todisco's bookmaking income.

At the time of Todisco's arrest, the Massachusetts police also seized betting slips for the dates April 2–13, 1973. The total gross wagers for those dates were as follows:

| Date | Gross Wagers |
|---|---|
| April 2, 1973 | $350.84 |
| 3 | 255.75 |
| 4 | 4,509.90 |
| 5 | 11,427.30 |
| 6 | 1,302.00 |
| 7 | 11,647.50 |
| 8 | 10,240.00 |
| 9 | 768.25 |
| 10 | 8,244.25 |
| 11 | 3,067.75 |
| 12 | 5,049.00 |
| 13 | 9,093.50 |

Copies of the actual betting slips for April 13, 1973 were introduced into evidence before the tax court. Copies of the slips for the dates April 2–12 were in the Commissioner's possession prior to trial, but were either lost or destroyed and so were unavailable at trial. No other betting slips or other wagering records were found or introduced into evidence, which was to be expected given Todisco's routine practice of destroying betting slips after two weeks.

On April 13, 1973, the one day for which copies of betting slips are available, Todisco's book won $4,690.25 and lost $4,140. Todisco's gross profits were thus $550.25 on gross wagers of $9,093.50, yielding a gross profit percentage of 6.05 percent. The April 13 betting was distributed among basketball, baseball, horseracing, and numbers as follows:

* Of the District of Columbia Circuit, sitting by designation.

| | Gross Bets | Bettor Lost | Bettor Won | Todisco's Gross Profit (Loss) |
|---|---|---|---|---|
| Basketball | $7,450.00 | $4,065.00 | $3,125.00 | $940.00 |
| Baseball | 330.00 | 225.00 | 75.00 | 150.00 |
| Horses | – | 350.00 | 857.00 | (507.00) |
| Numbers | – | 50.25 | 83.00 | (32.75) |
| | $9,093.50 | $4,690.25 | $4,140.00 | $550.25 |

Gross wagers for numbers and horseracing were not recorded; from the gross wagers on other events, it is possible to determine that the combined gross wagers on numbers and horseracing was $1,313.50. Thus, on that one day, Todisco suffered losses on horses and numbers, and had a gross profit of 12.6 percent on basketball wagers and 45 percent on baseball wagers.

## II. TAX COURT DETERMINATION OF TODISCO'S GROSS PROFIT PERCENTAGE

At trial, the Commissioner argued that Todisco's gross profit percentage to be used in calculating Todisco's estimated gross income from bookmaking should be ten percent. As Special Agent Avila, the revenue agent assigned to Todisco's audit, testified, "In reviewing the betting slips, I could see the profit line built right in.... It cost you $5.50 to make $5.00." Avila's testimony reflected Pellegrino's earlier testimony that a bettor would have to put up $55 to win an additional $50 on a basketball game.

Todisco's estate argued that Special Agent Avila's conclusion that Todisco's gross profit percentage was ten percent did not follow from the premised odds. It noted that if one posited a basketball game for which the total bets for each side were equal, i.e., a game with a so-called balanced book, with, say, $55 bet on each side, then Todisco would pay out $50 to the winner and collect $55 from the loser, thereby producing a gross profit of $5 on total wagers of $110; assuming a balanced book, then, Todisco's gross profit percentage would be 4.54 percent. Pellegrino testified that recovering this percentage, known to bookmakers as the "juice," was Todisco's intended means of making a profit, and that Todisco, when presented with an especially unbalanced book, would place balancing bets with other bookmakers to reduce his potential exposure should the team more heavily bet on win. The estate also noted that the actual gross profit percentage for April 13, 1973, the one day for which sufficient records were available, was 6.05 percent. The estate argued that the segment of the betting generating the highest gross profits and a higher-than-average gross profit percentage, basketball, was overrepresented in the betting slips for April 13, 1973 because three NBA playoff games, including one involving the Boston Celtics, were played on that date; as Pellegrino testified, bettors would "go wild" during the playoffs. Finally, the estate presented considerable evidence that Todisco's net worth and lifestyle were inconsistent with the amount of bookmaking income a ten percent gross profit percentage would indicate.

The tax court acknowledged that the Commissioner's method for calculating Todisco's gross profit percentage was spurious. It also found from an examination of the betting slips from April 13, 1973 that the factual assumption underlying the estate's theoretical estimate of Todisco's gross profit percentage at 4.54 percent, i.e., Todisco's having kept a balanced book, did not obtain. For example, on the Boston Celtics-Atlanta Hawks game of April 13, 1973, $2,885 was bet on the Celtics, but only $1,100 was bet on the Hawks. While it is true that Todisco would try to compen-

sate for a particularly unbalanced book by making balancing bets with other bookmakers, the fact that he was willing to accept unbalanced wagers made it impossible in the tax court's eyes to use 4.54 percent as the best estimate of Todisco's gross profit percentage. The tax court concluded, "[I]t is impossible, without adequate records, to know what his exact profit percentage was," but "[a]fter careful consideration of all the facts in the record, with particular emphasis on the spread of profit percentages among the events on April 13, 1973, we find that Todisco's profit percentage was 8 percent." 46 T.C.M. at 41.

■ The estate contends that the evidence does not support a finding that Todisco's gross profit percentage exceeded 6.05 percent. Since the determination of Todisco's gross profit percentage is a matter of fact, we examine the finding of the tax court only for the presence of clear error. *Taylor v. Commissioner*, 445 F.2d 455, 459 (1st Cir.1971). Because we can discover no material support in the record for a gross profit percentage of eight percent (or any other figure in excess of 6.05 percent), we are obliged to conclude that the tax court committed clear error in calculating the 1973 tax deficiency on the basis of a profit percentage of eight percent.

The tax court's sole stated ground for estimating the 1973 gross profit percentage at eight percent was the spread of profit percentages on April 13, 1973: 45 percent for baseball, 12.6 percent for basketball, and losses on numbers and horseracing. For this spread to be evidence for a higher gross profit percentage than 6.05 percent, the court was required to find either that the profitable bets were systematically underrepresented in the mix of betting for April 13, 1973, or that the various profit percentages were systematically too low, or both. As to the former, the evidence suggests, if anything, that the profitable bets were overrepresented on that date, since April 13 fell both at the beginning of

the baseball season, when bets could be expected to be higher, and during the NBA playoffs, in which the Boston Celtics were involved, while numbers and horseracing presumably continued year around or nearly so at constant levels. As to the latter, the only evidence presented was the theoretical estimate based on a balanced book of 4.54 percent for sporting events, and testimony by Pellegrino that Todisco's profit margins on horseracing and numbers were 5 and 50 percent, respectively, and that baseball wagering generally lost money for bookmakers and was only offered as a service to bettors. Thus, aside from wagering on numbers, which made up only a tiny fraction of the total wagers, the evidence suggests that Todisco's long-term gross profits were around five percent, as Pellegrino testified; there is, in any event, no evidence that Todisco's gross profit percentage exceeded 6.05 percent, the amount earned on April 13, 1973.

In support of the reasonableness of the tax court's eight percent gross profit percentage, the Commissioner makes two arguments. First, he suggests the actual gross profit percentage achieved on April 13, 1973, 6.05 percent, was abnormally low because, as Pellegrino testified, on a typical day, Todisco would not have lost money on horses and numbers. True enough, but Pellegrino's testimony also suggests that on a typical day Todisco would not have made as much as 45 percent on baseball and 12.6 percent on basketball either. The tax court cannot, at least without some reasonable basis for doing so, select out from Pellegrino's testimony only those aspects which make for a higher tax.

Second, the Commissioner argues that Todisco's failure to keep a balanced book on April 13 warrants disregarding the 4.54 percent theoretical estimate and assuming a figure such as eight percent. We disagree. Pellegrino's testimony was all to the effect that Todisco undertook to keep as balanced a book as possible, and that Todisco's profit came from the "juice."[1] Such

1. At another point in his brief, the Commission-

er attacks the consistency of Pellegrino's testi-

intentions are admittedly only indirect evidence of their desired result, but they are evidence nonetheless. On the other side of the scale, there is *no* evidence that Todisco consciously refused wagers because he thought the bettor had picked a winner, that he himself solicited wagers other than balancing wagers with other bookmakers, or that such practices are customary among bookmakers. The mere fact that he did not have a perfectly balanced book with respect to the April 13 basketball games is as easily explained by the difficulty of finding someone in Boston who would cover bets against the Celtics as by some theory that Todisco was skilled at increasing his take by covering only those bets on which he was likely to lose out. For this latter theory to hold water, we think it was necessary for there to be some other supporting evidence. There is none. The only actual evidence is that Todisco's criterion for refusing or soliciting wagers was their tendency to disturb or create a balanced book.

We recognize that the necessity for estimating Todisco's income arose from Todisco's failure to maintain adequate records. This fact inclines us to uphold any reasonably supported estimate made here. Still, there must be some basis for the figure selected. We note, moreover, that records for 11 of the 12 days for which slips were kept were either lost or destroyed while in the custody of the state or the Commissioner. The Commissioner thus bears some responsibility for the lack of evidence upon which to reconstruct taxpayer's earnings.

Furthermore, this is not a case in which the Commissioner alleges that the few figures available relative to taxpayer's activities were inaccurate. *See, e.g., Truman v. Commissioner*, 8 T.C.M. (CCH) 108 (1949). As the tax court stated in *Rainwater v. Commissioner*, 23 T.C. 450 (1954),

[T]rue, petitioner had destroyed [the original betting slips for all but a two-week period,] and thus has made the Commissioner's task of auditing the returns immeasurably more difficult than it should be. This is conduct that is not to be condoned. Perhaps the Treasury should seek and the Congress should provide it with appropriate and effective sanctions, civil or criminal or both, against taxpayers who fail to keep or who do away with important records bearing on their liability. But, under the law as it now stands we are not empowered to approve deficiencies merely because records have been destroyed.

*Id.* at 456. Because the Commissioner has presented no credible arguments or evidence for setting Todisco's gross profit percentage higher than the 6.05 percent that the extant records indicate, we think the tax court's finding that Todisco's gross profit percentage was eight percent was arbitrary and excessive, and so unsustainable. *See Helvering v. Taylor*, 293 U.S. 507, 514–15, 55 S.Ct. 287, 290–91, 79 L.Ed. 623 (1935). On remand, the tax court should recalculate the estate's tax liability applying the 6.05 percent figure.

## III. ERRONEOUS ASSIGNMENT OF BURDEN OF PROOF

The estate suggests that the tax court erroneously placed the burden of disproving the Commissioner's deficiency calculation on the estate; in so arguing, the estate relies on *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), for the proposition that a "naked" assessment of tax is without validity.

Our response is twofold. First, in light of the fact that the tax court accepted neither the Commissioner's determination

---

mony. The alleged inconsistency arises from his testimony at various points that Todisco's gross profit percentage was about five percent, but that Todisco's average weekly gross profits were about $500 and his typical weekly gross wagers during non-playoff periods were roughly $2,000. From the latter two figures the Commissioner imputes to Todisco the conclusion that Todisco's profits were in fact roughly 25

percent, thereby ignoring the fact that the $2,000 figure was stated to be Todisco's typical weekly gross wagers during non-playoff periods. In light of Pellegrino's testimony that bettors would be "wild" during the playoffs, thereby greatly increasing the weekly wagers, we find nothing necessarily inconsistent in his testimony.

of Todisco's gross profit margin nor of the amount of his gross wagers, but instead made its own findings, the question of the allocation of burdens seems irrelevant. Second, granting for the sake of argument that the Commissioner's method of arriving at a ten percent gross profit margin was arbitrary and that the Commissioner shares in the fault along with Todisco for the lack of evidence of Todisco's bookmaking operations, it is clear nonetheless that Todisco earned bookmaking income in 1972 and 1973. The Commissioner's present action is thus not a naked assessment of tax.

 The Commissioner calculated Todisco's gross income from bookmaking by taking Todisco's gross wagers from the period April 2–13, 1973 to be his total gross wagers for an even two-week period, dividing it by two to obtain his average weekly wagers, multiplying the average by the ten percent estimated profit margin to obtain average weekly profits, and finally multiplying the average weekly profit by the number of weeks in 1972 and 1973 that Todisco ran his bookmaking operation to obtain gross income from wagering in those years. We agree with the tax court's approval of both the commissioner's general method for calculating Todisco's gross bookmaking income and his method for calculating Todisco's gross wagers as reasonable. The fact that the Commissioner's calculation may have been based in part on an erroneous formula for determining gross profit percentage does not disturb the basic rule in all tax cases that the burden of proof rests on the taxpayer. *United States v. Rexach*, 482 F.2d 10 (1st Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973). As to the only aspect of the Commissioner's calculations that might be said to be arbitrary, the determination of Todisco's gross profit margin to be ten percent (reduced by the tax court to eight percent), this court has already accepted the estate's argument in the previous section.

**2.** As a general matter, expenses that fall within section 62 are taken into account in computing a taxpayer's adjusted gross income, and hence are available as a deduction to all individuals

## IV. STATE TAXES

Section 165(d) of the Internal Revenue Code provides as follows:

(d) **Wagering losses.**—Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions.

In *Offutt v. Commissioner*, 16 T.C. 1214 (1951), the tax court held that the predecessor of section 165(d) in the Internal Revenue Code of 1939 limited the deductibility of the mailing, printing, and stenographic expenses of a bookmaker to the amount of his wagering income. Under the authority of *Offutt*, the Commissioner limited the availability as a federal income tax deduction of the $36,446.25 seized by the Massachusetts State Police in 1973 in payment of state income taxes, which would otherwise be deductible under I.R.C. § 164, to the amount of Todisco's bookmaking income in 1973. The tax court adopted this position below.

The estate argues that the section 164 deduction for state income taxes is generally not considered an expense "attributable to a trade or business carried on by the taxpayer" for the purposes of calculating adjusted gross income under I.R.C. § 62(1).[2] *See* 26 C.F.R. § 1.62–1(d); *Tanner v. Commissioner*, 45 T.C. 145, *aff'd*, 363 F.2d 36 (4th Cir.1966). 26 C.F.R. § 1.62–1(d) explains that state income taxes are generally not "attributable to a trade or business" because they are too "remotely[ ] connected with the conduct of a trade or business." Therefore, since they are not attributable to Todisco's bookmaking for purposes of computing his adjusted gross income under section 62(1), so the estate argues, they are not losses from wagering for purposes of section 165(d). This argument also distinguishes the expenses whose deductibility was held in *Offutt* to be subject to the section 165(d) limitation,

while most other deductions are used in computing taxable income, and hence are available to an individual only if he or she itemizes, *see* I.R.C. § 63.

since mailing, printing, and stenography would fall within section 62(1).

■ As a general matter, we agree with the proposition that state taxes levied on an individual's net income from all sources are too remotely connected to any wagering income that an individual might have to be subject to section 165(d). In this case, however, the taxes assessed represented amounts confiscated from Todisco specifically for state income taxes due on Todisco's bookmaking income. 46 T.C.M. at 38. This particular assessment is thus directly tied to Todisco's bookmaking income, and hence is subject to the limitation of section 165(d).[3] In analogous settings, the IRS has ruled that state individual income taxes on net income from business profits are attributable to a taxpayer's trade or business for the purpose of computing the amount of any net operating loss carryforward or carryback under I.R.C. § 172(d)(4), see Rev. Rul. 70–40, 1970–1 C.B. 50. Moreover, in direct response to the estate's argument, the IRS has ruled that state taxes on gross income directly attributable to an individual's trade or business are deductible for the purpose of determining adjusted gross income under section 62(1). Rev.Rul. 58–142, 1958–1 C.B. 147, reaff'd, Rev.Rul. 70–40, 1970–1 C.B. 50. Accordingly, on the facts of this case, we see no reason not to extend the reasoning of Offutt to state income taxes paid by an individual on gambling income.

## V. FEDERAL WAGERING EXCISE TAXES

Section 446(b) of the Internal Revenue Code provides as follows:

(b) **Exceptions.**—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

The estate argues that the tax court erred in upholding the decision of the Commissioner to compute Todisco's taxable income from bookmaking on a cash basis. The upshot of that decision is that the ten percent federal excise tax on gross wagers imposed on Todisco in 1973 has never been available as a deduction against Todisco's income taxes, since it has never been paid. The estate suggests that the taxes accrued in 1972 and 1973, and that the only method of accounting that clearly reflects Todisco's bookmaking income for those years would be to allow the excise taxes as deductions when accrued.

This argument has one fatal factual flaw: as a comparison of the amount of the excise tax levied ($49,467.04) and the original estimate by the Commissioner of Todisco's estimated gross wagers for 1973 ($494,670.30) reveals, the excise tax was imposed only on Todisco's 1973 gross wagers. Since Todisco's losses and expenses from 1973 bookmaking aside from the excise tax already exceeded his 1973 bookmaking income, and since the estate concedes that federal wagering excise taxes are subject to the section 165(d) limitation, a change of accounting method would have no effect on Todisco's 1973 taxable income. Furthermore, a change in accounting method could not affect Todisco's 1972 taxable income, since the taxes accrued in 1973.[4]

The decision of the tax court is affirmed, except for that part pertaining to the deficiency due for the taxable year 1972 and

---

3. It should be noted that Massachusetts during 1973 imposed a flat tax on taxable income, using federal definitions of income as its starting point. Mass.Gen.Laws ch. 62, § 4. Because the tax is flat, the amount assessed against Todisco for his bookmaking income is less dependent on the amount of his other income than would be the case under a progressive tax.

4. Before the tax court, the estate evidently advanced the argument that the amount of state income and federal excise taxes not available in 1973 because of the section 165(d) limitation could be carried back to 1972 as a net operating loss under I.R.C. § 172(c). The tax court correctly rejected this argument on the grounds that "the section 165(d) limitation means that petitioner has no 'excess of the deductions allowed by this chapter over the gross income' for 1973, and thus has no net operating loss to be carried back from 1973." 46 T.C.M. at 45.

**8**

the additional tax due for that year, which are vacated and the cause is remanded to that court for recomputation in accordance with the opinion filed this date.

No costs.

*So ordered.*