**OAK MANUFACTURING CO., Plaintiff-Appellant,**

v.

**The UNITED STATES of America, Defendant-Appellee.**

No. 13520.

United States Court of Appeals Seventh Circuit.

April 4, 1962.

**260**

Peter B. Atwood, Chicago, Ill., for appellant.

James P. O'Brien, U. S. Atty., Chicago, Ill., Louis F. Oberdorfer, Asst. Atty. Gen., John A. Bailey, Atty., Tax Division, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., for appellee. Robert A. Maloney, Asst. U. S. Atty., of counsel.

Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

This appeal involves a claim for refund of federal income taxes for the years 1954, 1955 and 1956. There is no dispute as to the facts. The question involved is whether amounts received by plaintiff (Oak) under an agreement executed November 9, 1936, with British N.S.F. Company, Ltd. (N.S.F.), as licensee, are taxable as long-term capital gains or as ordinary income. Oak contends that the amounts received by it under Paragraph 5 of the 1936 agreement were installment payments in respect to the sale of capital assets, namely, the patents referred to in the agreement. However, the District Court held the receipts from N.S.F. were ordinary royalty income. The Court emphasized the agreement contained no language of sale.

To determine its legal effect, a somewhat detailed examination of the provisions of the 1936 agreement seems necessary. This agreement purports, in paragraph 1, to be a grant or license by Oak to N.S.F. of "exclusive rights to manufacture and sell all Oak products within all European countries and within all the units of the British Empire including the Irish Free State, with the exception of Canada, in which country Oak reserves the rights to manufacture and sell for itself therein in competition with N.S.F."

The agreement recites that Oak manufactures switches, vibrators and other electrical parts and designs such parts, and that " * * * N.S.F. is desirous of establishing a vibrator and switch business and selling such parts and devices or of making such parts and devices themselves and selling them. * * *"

In paragraph 2 of the agreement, Oak agreed to " * * * disclose and furnish to N.S.F. all of its products and improvements thereon together with manufacturing methods and processes in connection

therewith * * *" as well as "* * * all required engineering assistance."

In paragraph 3, Oak agreed to sell all component parts of Oak products to N. S.F. at cost plus twenty-five percent profit.

In paragraph 4, Oak agreed "* * * to apply for patent protection in whatever countries it may consider necessary * * * to protect N.S.F. * * *." Upon Oak's failure to do so, N.S.F. was given the right to apply for patents in the various countries.

Under paragraph 5, N.S.F. agreed to pay Oak a royalty of five percent of the net selling price of switches and vibrators. Under paragraph 6, the royalties were payable quarterly. Pursuant to the agreement, Oak received from N.S.F. in 1954 the sum of $27,701.81; in 1955, $52,719.36 and in 1956, $62,607.84.

·In paragraph 7, the agreement provided, in part, that N.S.F. would use its best efforts to promote the manufacture and sale of Oak vibrators and switches within its territory, and to disclose to ·Oak all engineering processes and all improvements which it may have on Oak parts or products, and agreed at the expense and upon demand by Oak, to execute and assign United States applications for patents covering such improvements.

Paragraph 8 provided, in part, "It Is Understood and Agreed That with respect to complete products N.S.F. occupies the position of an expert sales organization and that it assumes all risks with regard to customers."

Paragraph 11 provided that N.S.F. might bring patent infringement suits in the name of Oak, paying Oak a royalty on sums recovered. However, Oak could, if it wished, control the prosecution of such suits. It was further provided that the agreement was not assignable by N.S.F. without written permission of Oak, but N.S.F. was permitted to sublicense. The agreement was to last for the duration of any of the English patents and for at least fifteen years.

The 1936 agreement did not describe the patents referred to either by name or number. However, Joint Exhibits 2 and 3 received in evidence do identify each of the patents. There were a number of American patents without any corresponding English patents, but most of the English patents did have corresponding United States patents.

It was stipulated that each of the patents set out in Joint Exhibits 2 and 3 constituted capital assets within the meaning of Sec. 1231 of the 1954 Internal Revenue Code, as amended, 26 U.S.C. § 1231, and had been owned and held by Oak more than six months before licensing same to N.S.F.

It was also stipulated and agreed that neither the license agreement nor the patents constituted property of a kind which would properly be includable in the inventory of Oak within the meaning of Sec. 1231(b) (1) (A) of the 1954 Internal Revenue Code, as amended, nor property held by Oak primarily for sale to customers in the ordinary course of its trade or business.

■ The District Court stressed the point that the agreement herein did not contain the language of sale. We do not consider this fact controlling. The transfer of substantially all the rights under the patent or invention is all that is necessary.

The Government points out that the agreement itself characterizes it as a "license agreement" and the amounts payable thereunder to Oak are referred to as "royalties." Granted this language is a relevant consideration, yet, as stated in Merck & Co. Inc. v. Smith (D.C.1957), 155 F.Supp. 843, 845, aff'd., 3 Cir., 261 F.2d 162, it "* * * is not controlling and, as a matter of fact, appears to have been given very little weight by the courts."

Numerous decisions have expressed the same idea. To illustrate: "The fact that the terms 'licensee,' 'sublicense,' and 'royalty' are used is not determinative." Holcomb v. Commissioner (1958), 30 T. C. 354, 358. Also, "* * * nomen-

clature of that kind has little if any significance in resolving the question whether the instrument amounted to an assignment or was a license. * * * " Watson v. United States, 10 Cir., 222 F.2d 689, 691. However, other courts have accorded substantial weight to the parties' own characterization and treatment of the agreement as indicative of what the parties intended. Commissioner of Internal Revenue v. Celanese Corp. of America, 78 U.S.App.D.C. 292, 140 F.2d 339, 340–341; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406, 408–410; Kimble Glass Co. v. Commissioner (1947), 9 T.C. 183, 185–186, 190.

■ A patent is an intangible asset. It is usually transferred by an assignment. If there is a transfer of all the substantial rights in a patent, it is considered an assignment and qualifies the transferor for capital gains treatment. A transfer of anything less is called a license with the resultant assessment of the tax at ordinary income rates. Merck & Co. Inc. v. Smith, 3 Cir., 261 F.2d 162, 164.

■ The opinions of the courts which have passed on the issue before us are not entirely harmonious. However, certain principles seem to be established. The entire agreement must be examined and analyzed to determine whether substantially all of the rights of the owner of the patent have been assigned and released to the transferee. The retention of the bare legal title may not represent the retention of a substantial right in some cases. See Lawrence v. United States, 5 Cir., 242 F.2d 542. Title 26 U.S.C. § 1235 specifically provides that for a transferor to receive favorable capital gain treatment, " * * * all substantial rights to a patent" must be transferred.

The United States cites many provisions of the "license" agreement to show that it did not amount to a sale or transfer of the patents. Among these are, 1) certain patents from which "royalties" were received were not in existence at the date of the agreement and hence

could not have been sold or transferred; 2) the United States patents conferred no rights in England; 3) the right to "use" the patents covered by the license was omitted; 4) the right to assign the agreement was omitted; 5) Oak retained control over infringement litigation; 6) N.S.F. had only a non-exclusive license in Canada; and 7) the agreement was not for the full period of the patents.

The primary consideration moving from Oak was the promise " * * * to disclose and furnish to N.S.F. all of its products and improvements thereon together with manufacturing methods and processes in connection therewith * * " and the promise " * * * to furnish all required engineering assistance."

■ The terms of the agreement contemplated a continuing business relation in the nature of a franchise for the distribution of Oak products in new markets. It was, in reality, the establishment of an agency relationship. There was no intent to transfer the ownership of the patents. At most, Oak merely licensed to N.S.F. certain rights thereunder.

The 1936 agreement provided: "This Agreement is not assignable by N.S.F. without the written permission of Oak." The subsequent provision for a qualified right to "sublicense others hereunder" makes it clear the prohibition against assignment was a substantial right. The Supreme Court has said that the power to dispose of property is the "equivalent of ownership." Harrison v. Schaffner, 312 U.S. 579, 580, 61 S.Ct. 759, 85 L.Ed. 1055. The phrase "sublicense others hereunder" and the remainder of the paragraph, is further evidence of the parties' intent that N.S.F. was not a purchaser or assignee but rather a licensee.

We think the right to control the prosecution of infringement suits was another item in the substantial "bundle of sticks" retained by Oak which prevents the agreement from being considered a sale or transfer. N.S.F. was permitted to sue only in Oak's name for the infringement of "Oaks Patents."

Significant also is the provision whereby Oak agreed to apply for patent protection in whatever countries it may consider necessary in order to protect N.S.F. against unauthorized competition. This clause would indicate Oak considered itself to be the complete owner of the patents and N.S.F. to be merely its European licensee or representative.

The provision that the agreement would last for the duration of any English Oak patent and at least fifteen years, indicates that Oak made no attempt to make certain the agreement would continue for the full life of all the patents involved. The life of a United States patent is seventeen years. Again, this is an indication that the agreement was, in fact, a license rather than a sale or transfer.

We hold the District Court reached the correct result. The judgment of the District Court is

Affirmed.