Walter JUDA and Renee Juda,
Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent,
Appellee.

No. 88-2007.

United States Court of Appeals,
First Circuit.

Heard April 5, 1989.

Decided June 12, 1989.

As Amended June 15, 1989.

Geoffrey J. O'Connor, for petitioners, appellants.

Teresa E. McLaughlin, Tax Div., Dept. of Justice, with whom James I.K. Knapp, Acting Asst. Atty. Gen., Gary R. Allen and Gilbert S. Rothenberg, Tax Div., Dept. of Justice, Washington, D.C., were on brief for respondent, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CAFFREY,* Senior District Judge.

BOWNES, Circuit Judge.

Appellants, Walter and Renee Juda (Juda), appeal the Tax Court's determination that they are not entitled to capital gains treatment under 26 U.S.C. § 1235 [1]

---

* Of the District of Massachusetts, sitting by designation.

1. This section reads in pertinent part:

(a) **General.**—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

for certain transactions involving the transfer of patents.[2] We affirm with one minor modification.

## FACTS

Our review of the facts found by the Tax Court is "only for the presence of clear error." *Estate of Todisco v. Commissioner*, 757 F.2d 1, 4 (1st Cir.1985); *see also Dennis v. Commissioner*, 473 F.2d 274, 281–83 (5th Cir.1973). We have reviewed the record in this case and found no clear error. We present only a synopsis of the facts; the full facts can be found in the Tax Court's opinion which will be published at 90 T.C. 1263.

Walter Juda is a limited partner in Cambridge Research and Development Group (Cambridge); his wife, Renee Juda, is a party to the suit only because they filed joint tax returns. Although the total deficiencies involved are less than $2,500, this is a test case involving Cambridge and its limited partners. Our decision, therefore, will impact on a number of other individuals.

Cambridge is a limited partnership formed in 1966 to own and develop products and ideas. Walter Juda joined as a limited partner in 1972. Originally, Cambridge licensed patent rights for inventions to corporations which were to develop and exploit the inventions commercially. Because of its dissatisfaction with the corporations' commercial development of the inventions, Cambridge changed its mode of operation. Starting in 1974, its modus operandi was as follows. Cambridge would first reach an agreement with the inventor regarding patent rights. Then, Cambridge would find an entrepreneur who was willing to be a general partner in a limited partnership involving that one invention. Cambridge would help the entrepreneur locate limited partners and capital. Finally, Cambridge would sell to the limited partnership the patent rights it had obtained from the inventor.

From 1974 to 1985, Cambridge organized individual limited partnerships around numerous inventions, three of which are relevant to this case: (1) the Fire Drill, a hydraulically-operated fire extinguisher; (2) the Gold Crown Discriminator, a device to enhance the functioning of hearing aids; and (3) the Cardiac Contraction Imager, which gives enhanced heart information from a routine chest x-ray. The contracts regarding the Gold Crown Discriminator and Cardiac Contraction Imager are not identical to the Fire Drill contracts, but they are, in relevant parts, essentially the same. Indeed, the parties have not argued that the differences are legally significant and the Tax Court did not distinguish between the contracts in its opinion.[3] We, therefore, will not set forth the facts pertinent to the Gold Crown Discriminator and the Cardiac Contraction Imager. It is sufficient to say that they followed the same pattern as the Fire Drill. Although our focus is on the Fire Drill, its range encompasses the other two inventions.

In 1975, John Chatfield, Jr., received a patent for the Fire Drill. On May 13, 1976, Cambridge entered into an agreement with Chatfield concerning the Fire Drill patent. The entire agreement, which is set forth as

---

**(b) "Holder" defined.**—For purposes of this section, the term "holder" means—
(1) any individual whose efforts created such property, or
(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—
(A) the employer of such creator, nor
(B) related to such creator (within the meaning of subsection (d)).
The appropriate holding time for capital asset treatment varied during the years relevant to

this case from six months to one year; these changes are not, however, pertinent to this case. The Internal Revenue Service's regulations on § 1235 are set forth at 26 C.F.R. §§ 1.1235–1, –2.

**2.** Juda has not appealed the Tax Court's ruling on two other issues involving the deductibility of fees and interest expenses.

**3.** We realize that the Tax Court made a factual distinction among the three inventions regarding the date of reduction to practice. Given our ultimate holding, however, this distinction is irrelevant.

an appendix to this opinion, can be synopsized as follows:

1. Chatfield transfers to Cambridge "all of the right, title and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW–HOW to be held and enjoyed by CAMBRIDGE, its successors and assigns, as fully as the same would have been held and enjoyed by INVENTOR if this grant had not been made."

2. "CAMBRIDGE agrees to use its best efforts to aid in the commercialization of the FIRE DRILL such as by consummating a sale of the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW to the COMPANY." "THE COMPANY" is described as "a business organization such as a limited partnership or corporation who shall purchase all of the right, title, and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW–HOW for the purpose of thereafter commercializing the FIRE DRILL."

3. "CAMBRIDGE'S liability to pay to INVENTOR the down payment and the purchase price balance payment shall arise only as and when payment to CAMBRIDGE is made by the COMPANY of the amounts negotiated for the down payment and purchase price balance."

4. "Upon execution of the Agreement, CAMBRIDGE shall continue, at its own expense, its exploration and evaluation of the FIRE DRILL and in this regard, shall examine the marketing and manufacturing aspects of the FIRE DRILL and its patent position, and the overall value of the FIRE DRILL as a new product to form the basis of the business of the COMPANY. CAMBRIDGE shall also carry on at its own expense such further technical development of the FIRE DRILL as it deems necessary or appropriate."

5. "CAMBRIDGE shall have the right, upon formation of the COMPANY and the successful consummation of the sale of the FIRE DRILL PATENT RIGHTS and KNOW–HOW to the COMPANY, to recover certain of its out-of-pocket expenses [including those of the activities described in paragraph 4] in connection with the transaction to the extent it is able to do so by negotiation with the COMPANY, and these expenses whether or not recovered from the COMPANY shall not reduce or be deducted from the down payment received from the COMPANY."

6. "CAMBRIDGE shall have the right to terminate this Agreement at any time if, based on its own judgment, the FIRE DRILL does not conform to its standards or criteria for the establishment of a successful venture based on the FIRE DRILL or if, in CAMBRIDGE'S judgment, the formation of the COMPANY will not be successfully completed."

7. "This Agreement shall terminate on December 31, 1976, unless the formation of the COMPANY has taken place on or prior to that date."

8. "If this Agreement is terminated either under paragraphs [6] or [7] above, then CAMBRIDGE shall reassign to INVENTOR all of the rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW assigned by INVENTOR to CAMBRIDGE, free and clear of any liens or obligations of any nature whatsoever."

On October 1, 1976, Cambridge entered into an agreement with the partners of The American Fire and Industrial Products Company (AMFIRE), a limited partnership, for the sale of Cambridge's rights in the Fire Drill to the partners, who then contributed it to the partnership. In this agreement, Cambridge stated that it owned the patent rights to the Fire Drill and was selling those rights to the partners. The assignments of the patent—from Chatfield to Cambridge and from Cambridge to AMFIRE—were both recorded in the Patent and Trademark Office on November 23, 1976.

■ Based on the purchase and subsequent sale of the Fire Drill rights, Cambridge's partners, including Juda, treated the gain realized as capital gain under § 1235.[4] The Commissioner of Internal

---

**4.** While Cambridge itself is not entitled to such tax treatment since it is not an individual, the individual partners are. 26 C.F.R. § 1.1235–2(d)(2).

Revenue disagreed and entered a deficiency. The Tax Court agreed with the Commissioner. It held that Cambridge did not "acquire" all substantial rights to the patent, but rather was acting like a broker or a middleman. As an alternative basis for its decision, the Tax Court held that Cambridge had not given "money or money's worth" in exchange for any rights it did acquire. With respect to the Gold Crown Discriminator and Cardiac Contraction Imager, the court held that any rights Cambridge acquired had not been acquired prior to the inventions' reduction to practice. Juda appeals each of these holdings.

## DISCUSSION

■ In deciding whether a transferee acquired all substantial rights to a patent, the nomenclature in the agreement is not controlling, rather the entire agreement must be examined to see if in fact all substantial rights were transferred. *E.I. du Pont de Nemours & Co. v. United States*, 432 F.2d 1052, 1055 (3d Cir.1970) (collecting cases); *Oak Mfg. Co. v. United States*, 301 F.2d 259, 261–62 (7th Cir.1962). "[T]he substance of each transaction should be looked to rather than the form in arriving at whether all substantial rights have been transferred." *Kirby v. United States*, 191 F.Supp. 571, 576 (S.D.Tex.1960), *aff'd*, 297 F.2d 466 (5th Cir.1961); *see also Walen v. United States*, 273 F.2d 599, 601 (1st Cir. 1959) ("a transaction is to be judged by its substance, and not by verbiage.").

■ Events subsequent to the execution of the transfer agreement at issue may be examined to determine the nature of what was being transferred. *Kirby*, 191 F.Supp. at 575–76. The intent of the parties may be a guide in determining the nature of the transfer. *Oak Mfg. Co.*, 301 F.2d at 262. A transfer for less than the full life of the patent is not a transfer of all substantial rights. *Wilkerson v. United States*, 435 F.2d 845, 846 (3d Cir.1970) (per curiam); *Oak Mfg. Co.*, 301 F.2d at 263; 26

C.F.R. § 1.1235–2(b)(1)(ii). Finally, we note that "the basic rule in all tax cases [is] that the burden of proof rests on the taxpayer." *Estate of Todisco*, 757 F.2d at 6. Although we have found no case involving similar facts, and the parties have cited none, we find that the general principles set forth *supra* amply support the Tax Court's holding.

The fact that the contract between Cambridge and the inventor uses the word "sale" is not controlling. What is controlling is the substance of the arrangement. Cambridge was not obligated to pay for the invention until it had located the end-purchaser and was paid by it. If no buyer could be found, the agreement and "sale" would lapse long before the expiration of the patent. Furthermore, while case law allows contingent payments to fit under the statute, the payment, in each case, was contingent on the amount received for sales or use of the *patented product. See, e.g., Robishaw v. United States*, 616 F.2d 507, 509, 222 Ct.Cl. 474 (1980) (royalties with respect to articles using the patented devices); *Lockhart v. Commissioner*, 258 F.2d 343, 349 (3d Cir.1958) (amount of sales of patented product; case was decided under 26 U.S.C. § 117 prior to the date of applicability of § 1235); *First Nat'l Bank of Princeton v. United States*, 136 F.Supp. 818, 821–22 (D.N.J.1955) (same). We have found no case in which the sales price, much less the sale, was contingent upon the *resale* of the *patent rights themselves*.[5] Cambridge was not furthering the development of the invention, rather it was agreeing to use its best efforts to find someone else who would. Under such circumstances, Cambridge, though in form a buyer, was in substance a middleman or broker.

Events subsequent to the inventor-Cambridge contract bolster our conclusion. The recording of the patent assignments in the Patent and Trademark Office (PTO) from the inventor to Cambridge and from Cambridge to the end-purchaser was done

---

**5.** *Kronner v. United States*, 110 F.Supp. 730, 126 Ct.Cl. 156 (1953), a case that appellants describe as having "some strong factual similarities" to the present situation, involves the assignment of patent rights by an inventor to the manufacturer of the product, not the assignment of rights to a party for the sole purpose of resale to someone else.

on the same day and long after Cambridge bought the patent rights. Under 35 U.S.C. § 261, patents are "assignable in law by an instrument in writing," but an assignment is void as against subsequent bona fide purchasers unless it is recorded in the PTO within certain time periods. The timing of the recording of the assignments is additional evidence that the agreement between the inventor and Cambridge was not intended as a final sale to Cambridge but was wholly contingent upon a resale to an investor. Furthermore, as per the contract, Cambridge paid for the inventor's patent with part of the money it received from the end-purchaser. The difference between Cambridge's payment to the inventor and Cambridge's payment from the end-purchaser was its profit.

Juda argues that two facts show that Cambridge acquired the patents. First, he points out that under the contract, it was Cambridge that actually paid the inventor and that the contract speaks in terms of sales. This, however, is irrelevant once the substance of the arrangement is examined. Cambridge was merely a conduit for the funds to flow through. It was the end-purchaser who effectuated the congressional purpose of financing the development of inventions, *not* Cambridge. Second, Juda argues that since Cambridge was the party in control of both the inventor-Cambridge contract and the negotiations with the end-purchaser, it could not be an agent or broker. This recognizes the power of a patent broker; it does not change Cambridge's status to that of a patent holder.

As the Tax Court noted, the record is devoid of any indication "that Cambridge ever intended to exploit the patents in any way other than through a subsequent sale to another company." In this context, it is unnecessary to decide whether Cambridge was in fact the inventor's "agent." It is enough to determine that Juda failed to meet his burden of showing that Cambridge acquired—and, hence, "transfer[red]"—"all substantial rights" to the patents at issue. Given all these considera-

tions, we see no clear error in the Tax Court's finding that Cambridge did not acquire "all substantial rights." [6]

The Commissioner concedes that the amount of the deficiency for 1977 was incorrectly entered and that it should have been $526, not $546. We, therefore, modify the 1977 deficiency to reflect the correct amount. In all other respects, the opinion of the Tax Court is

*Affirmed.*

## APPENDIX

This agreement is made this 13th day of May, 1976, by and between CAMBRIDGE RESEARCH AND DEVELOPMENT GROUP, a Connecticut limited partnership, having an office and place of business at 21 Bridge Square, Westport, Connecticut 06880 ("CAMBRIDGE"), and JOHN F. CHATFIELD, JR. of 44 Adams Road, Easton, Connecticut ("INVENTOR").

## WITNESSETH:

WHEREAS, INVENTOR has conceived of, designed, and begun development of a new Hydraulically Operated Fire Extinguishing Drill, and has obtained a United States Patent, No. 3,865,194, relating to such Drill, and

WHEREAS, CAMBRIDGE wishes to acquire the rights to the Drill, and to further develop and aid in the commercialization of the Drill.

NOW THEREFORE, in consideration of the mutual promises contained hereinafter, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1. FIRE DRILL means INVENTOR'S inventions and developments relating to a Hydraulically Operated Fire Extinguishing Drill which is the subject matter of United States Patent No. 3,865,194, together with any variations, improvements, and modifications now in existence (such as a saw

---

**6.** Given this holding, we need not reach the alternative bases given by the Tax Court for its decision.

attachment for the Drill) or hereafter developed by INVENTOR.

2. PATENT RIGHTS means United States Patent No. 3,865,194, issued February 11, 1975, and any reissue or extension thereof, and any patents issuing on any application filed hereafter relating to the FIRE DRILL, and any corresponding foreign patents or foreign patent applications whether now in existence or hereafter filed.

3. KNOW–HOW means all technical information, plans, blueprints, prototypes, specifications, formulae and designs, market information, business plans, statistics, supplier information and correspondence with others relating to the FIRE DRILL.

4. The COMPANY means a business organization such as a limited partnership or corporation who shall purchase all of the right, title, and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW–HOW for the purpose of thereafter commercializing the FIRE DRILL.

## ARTICLE II

1. INVENTOR hereby sells, assigns, transfers, and conveys to CAMBRIDGE, its successors and assigns (subject to the provisions of Article III hereinafter) all of the right, title and interest in and to the FIRE DRILL, the PATENT RIGHTS, and the KNOW–HOW to be held and enjoyed by CAMBRIDGE, its successors and assigns, as fully as the same would have been held and enjoyed by INVENTOR if this grant had not been made.

2. INVENTOR will execute, without further consideration, any documents which are necessary or desirable to evidence or establish CAMBRIDGE'S ownership of the FIRE DRILL acquired pursuant to this Agreement, or to secure protection therefor, including patent application papers, assignments, litigation papers, and the like.

## ARTICLE III

1. CAMBRIDGE agrees to use its best efforts to aid in the commercialization of the FIRE DRILL such as by consummating a sale of the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW to the COMPANY. Such sale shall be on terms and conditions to be determined and negotiated by CAMBRIDGE with the COMPANY, but in no event shall a sale be consummated under terms pursuant to which INVENTOR will not receive at least the following:

(a) A down payment payable by CAMBRIDGE to INVENTOR equal to fifty percent (50%) of any down payment received by CAMBRIDGE in connection with the sale of the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW to the COMPANY, after deducting CAMBRIDGE'S expenses as hereinafter defined in paragraph 4 of this Article. In no event, however, shall INVENTOR'S down payment be less than a sum equal to Two Hundred and Fifty Thousand Dollars ($250,000), such $250,000 down payment consisting of a minimum of Twenty–Five Thousand Dollars ($25,000) in cash and the balance in negotiable notes of reputable credit-worthy makers, such notes being secured by Letters of Credit to the extent that CAMBRIDGE, using its best efforts, is able to obtain such Letters of Credit. To the extent that the down payment to CAMBRIDGE consists of negotiable notes and an amount of cash in excess of $50,000, CAMBRIDGE agrees to pay INVENTOR at least fifty percent (50%) of such cash as his cash portion of the down payment. In addition, to the extent that not all of the negotiable notes are secured by Letters of Credit, CAMBRIDGE agrees to assign to INVENTOR at least a proportion of such secured negotiable notes which bears the same ratio to the total amount of such secured notes as INVENTOR'S total down payment bears to the total down payment made to CAMBRIDGE by the COMPANY; plus

(b) a purchase price balance payment equal to fifty percent (50%) of the balance of the purchase price actually received by CAMBRIDGE for the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW. The potential for INVENTOR'S purchase price balance payment being not less than

One Million One Hundred Fifty Thousand Dollars ($1,150,000), the total balance payable being represented by a note of the COMPANY due within a period not to exceed ten (10) years and bearing interest at a rate to be negotiated between CAMBRIDGE and the COMPANY, such balance being mandatorily prepayable by the COMPANY from time to time by the COMPANY, on terms to be negotiated with the COMPANY, and the total balance being secured by the rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW-HOW.

(c) CAMBRIDGE'S responsibility in connection with the payments to INVENTOR in subparagraphs (a) and (b) above is to negotiate a sale to the COMPANY on terms producing sums sufficient to yield the amounts set out in subparagraphs (a) and (b) above. CAMBRIDGE'S liability to pay to INVENTOR the down payment and the purchase price balance payment shall arise only as and when payment to CAMBRIDGE is made by the COMPANY of the amounts negotiated for the down payment and purchase price balance. CAMBRIDGE, however, shall not assign the FIRE DRILL, the PATENT RIGHTS and KNOW-HOW to the COMPANY unless and until payment of the down payment is made by the COMPANY to CAMBRIDGE and a concurrent payment of the INVENTOR'S DOWN PAYMENT to INVENTOR as set forth in subparagraph (a) above.

CAMBRIDGE shall pay to INVENTOR his portion of the purchase price balance as and when such is received from the COMPANY. In the event that the COMPANY defaults on the note and CAMBRIDGE forecloses on the security, CAMBRIDGE shall reassign the PATENT RIGHTS and the KNOW-HOW to INVENTOR and promptly distribute to INVENTOR his share of any additional recovery it is able to make from the COMPANY on the note.

2. Upon execution of the Agreement, CAMBRIDGE shall continue, at its own expense, its exploration and evaluation of the FIRE DRILL and in this regard, shall examine the marketing and manufacturing aspects of the FIRE DRILL and its patent position, and the overall value of the FIRE DRILL as a new product to form the basis of the business of the COMPANY. CAMBRIDGE shall also carry on at its own expense such further technical development of the FIRE DRILL as it deems necessary or appropriate. These activities shall be carried on by CAMBRIDGE in a reasonable and businesslike manner and shall be actively pursued. Based on positive results of its evaluation, exploration and development activities, CAMBRIDGE shall aid the COMPANY (together with INVENTOR) in the determination of the amount of working capital required for the COMPANY, based on the COMPANY'S business plan, and shall negotiate with the COMPANY the terms and conditions pursuant to which the FIRE DRILL shall be sold to the COMPANY. Upon completion of the necessary legal papers to sell the FIRE DRILL to the COMPANY, and to conduct a private offering of interests or shares in the COMPANY, CAMBRIDGE shall at the request of the COMPANY, aid the COMPANY in securing of investment capital for the COMPANY from which the COMPANY shall obtain its working capital and the funds for the down payment to be made on the purchase of the FIRE DRILL and the PATENT RIGHTS and KNOW-HOW.

3. CAMBRIDGE shall bear the responsibility for all expenses incurred in connection with the activities set out in paragraph 2. above, including (a) all out-of-pocket expenses including legal fees, accountants' fees, travel, meals and lodging, and fees to consultants, and (b) its own costs, including CAMBRIDGE'S direct employee labor costs and overhead allocated to these activities. INVENTOR shall have no responsibility or liability for any of the expenses referred to above.

4. CAMBRIDGE shall have the right, upon formation of the COMPANY and the successful consummation of the sale of the FIRE DRILL PATENT RIGHTS and KNOW-HOW to the COMPANY, to recover certain of its out-of-pocket expenses as defined in subparagraph (a) of paragraph 3. above in connection with the transaction to the extent it is able to do so by negotiation

with the COMPANY, and these expenses whether or not recovered from the COMPANY shall not reduce or be deducted from the down payment received from the COMPANY. CAMBRIDGE'S own expenses, as defined in subparagraph (b) above, shall be fixed at $200,000 and shall be non-accountable. To the extent that CAMBRIDGE is required to actually pay financial consulting fees to third parties regarding the offering of interests or shares in the COMPANY, such fees shall be added to the $200,000 of CAMBRIDGE'S own expenses and the sum of such expenses shall be deducted from the down payment made by the COMPANY for the purchase of the FIRE DRILL, the PATENT RIGHTS and KNOW–HOW, prior to the determination of INVENTOR'S down payment but in no event shall such expenses reduce INVENTOR'S down payment to less than the amount set out in Article III, paragraph 1(a).

## ARTICLE IV

1. INVENTOR agrees to aid CAMBRIDGE in the efforts and activities set out in Article III, and he will generally cooperate with and assist CAMBRIDGE as requested from time to time. In this regard, he will, on reasonable notice, attend meetings, give information and advice, and to supply whatever relevant documents and materials he has available. To the extent that INVENTOR is required or asked by CAMBRIDGE to travel or attend meetings away from his home, any out-of-pocket expenses approved in advance that he incurs for transportation, meals, lodging, and the like, shall be borne by CAMBRIDGE.

2. INVENTOR covenants that he will not hereafter execute any instrument or take any action whatsoever which is inconsistent with the grant of rights to CAMBRIDGE under this Agreement.

3. INVENTOR does hereby represent and warrant as follows:

(a) That he is the sole and exclusive legal owner of the FIRE DRILL and the PATENT RIGHTS and KNOW–HOW;

(b) That he has the power to make this agreement;

(c) That there are no liens, encumbrances, shop rights or licenses in favor of any other person, firm or corporation with respect to the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW;

(d) That no litigation is presently pending or threatened against INVENTOR that would challenge or limit the validity, use, exploitation or transfer of such FIRE DRILL, the PATENT RIGHTS and KNOW–HOW.

## ARTICLE V

1. CAMBRIDGE shall have the right to terminate this Agreement at any time if, based on its own judgment, the FIRE DRILL does not conform to its standards or criteria for the establishment of a successful venture based on the FIRE DRILL or if, in CAMBRIDGE'S judgment, the formation of the COMPANY will not be successfully completed.

2. This Agreement shall terminate on December 31, 1976, unless the formation of the COMPANY has taken place on or prior to that date.

3. If this Agreement is terminated either under paragraphs 1. or 2. above, then CAMBRIDGE shall reassign to INVENTOR all of the rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW assigned by INVENTOR to CAMBRIDGE, free and clear of any liens or obligations of any nature whatsoever. This document shall under such circumstances constitute a reassignment of the rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW and shall vest title to such in the INVENTOR. CAMBRIDGE agrees to execute any further documents required or desirable to evidence INVENTOR'S rights to the FIRE DRILL, the PATENT RIGHTS and the KNOW–HOW.

## ARTICLE VI

1. Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration, to be held in Westport, Connecticut, in

accordance with the then current rules of the American Arbitration Association, and, insofar as practicable, within thirty (30) days after the giving by either party to the other of a notice specifically identifying the point or points in controversy and requesting arbitration as to such point or points. Any decision or award by the arbitrators shall be final and binding upon the parties and judgment may enter thereon in any court of competent jurisdiction. Arbitration in accordance with this paragraph shall be an exclusive remedy and shall preclude and bar any action or law or in equity by either party with respect to an arbitrable matter.

2. This Agreement shall inure to the benefit of the parties hereto and their heirs, successors and assigns. However, INVENTOR shall have the right only to assign his right to collect payments and may not delegate or assign any of his obligations under this Agreement. CAMBRIDGE shall not have the right to assign any of its obligations or duties under this Agreement, except to the extent that such assignment is incident to the sale of all or part of its business.

3. This Agreement shall be construed and interpreted under the laws of the State of Connecticut.

4. This Agreement constitutes the entire understanding of the parties and may not be modified, altered or amended in any way except by an agreement in writing duly executed by the parties hereto.

5. CAMBRIDGE agrees to keep INVENTOR or his counsel, designated as such in writing, advised as to the progress of its activities pursuant to this Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hand and seal on the date first above written.

Cambridge Research and
Development Group
By/s/ Lawrence M. Sherman
Lawrence M. Sherman
General Partner
John F. Chatfield, Jr.
/s/ John F. Chatfield, Jr.

WITNESS:
/s/ [Signature]
WITNESS:
/s/ [Signature]