RUDOLPH W. AND ABBIE A. STEFFLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Steffler v. Commissioner
Docket No. 10545-91
United States Tax Court
T.C. Memo 1995-271; 1995 Tax Ct. Memo LEXIS 272; 69 T.C.M. (CCH) 2940; June 19, 1995, Filed *272 Decisions will be entered under Rule 155. For petitioners: Oscar Nipper and Donn A. Joers. For respondent: Sheri Wilcox. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: Additions to tax and increased interest
Sec. Sec.
Sec.
Sec.
Sec. Year
Deficiency
6621(c)
6653(a)
6653(a)(1)
6653(a)(2)
6659 1979
$ 10,002
--
$ 500
--
--
$ 3,001
1980
720
--
36
--
--
216
1982
6,919 * --
$ 346 *
2,076
1983
14,112 * --
706 *
4,234
1984
154
--
--
8 *
-- * Amount to be determined.
After concessions by the parties, the issues for decision are: (1) Whether the parties reached a settlement agreement covering petitioners' investment in International Recovery Inc. (International Recovery). We hold that they did not. (2) Whether petitioners were engaged in the trade or business of commodities trading during 1985, 1986, and 1987. We hold that they were not. (3) Whether petitioners may deduct Schedule C option losses of $ 1,141 for 1984, and whether petitioners can deduct Schedule C travel and entertainment *273 expenses of $ 479 for 1983. Petitioners have conceded these issues. (4) Whether petitioners are liable for increased interest pursuant to section 6621(c) for 1982 and 1983. We hold that they are to the extent set forth herein. (5) Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a)(1) and (2) for their 1982, 1983, and 1984 tax years. We hold that they are to the extent set forth herein. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts and attached exhibits. Petitioners, Rudolph W. Steffler (petitioner) and Abbie A. Steffler (Mrs. Steffler), are husband and wife and resided in Houston, Texas, at the time they filed their petition. In 1983, petitioners invested in International Recovery, a mining tax shelter. Petitioners' son, an accountant, visited the mine site and verified that the mining operation was a "legitimate deal" and a "going concern". Neither petitioners *274 nor their son have training in geology. Settlement of the Tax Shelter
Respondent examined petitioners' 1982 through 1984 Federal income tax returns and disallowed the deductions associated with International Recovery. Oscar Nipper (Nipper) and Geoffrey Clark (Clark) represented petitioners during respondent's examination. In an undated letter, appeals officer Elsie F. McKenzie (McKenzie) proposed a settlement of the International Recovery issues and asked petitioners to respond by November 24, 1987. On November 20, 1987, petitioners assented to the proposed settlement by placing an "X" next to the sentence, "I wish to accept the administrative offer to settle my case." At the bottom of that same page petitioners indicated "THIS ACCEPTANCE IS SUBJECT TO A FAVORABLE RESOLUTION OF THE FOLLOWING ITEMS * * *," and petitioners set forth the unresolved items. McKenzie informed petitioners that respondent was not obligated to the terms of the first settlement offer if the "side issues" raised by petitioners were not settled. The parties did not resolve the side issues, and respondent transferred the case to revenue agent Karen Winn (Agent Winn). Field examination manager *275 Marcia Swift (Swift) served as Agent Winn's supervisor during this time. Agent Winn met with Nipper and Clark in October 1988 to discuss a settlement, and she discussed respondent's proposal with Clark. In a letter dated November 18, 1988, Agent Winn proposed to settle the International Recovery issues and mailed a closing agreement to petitioners. Agent Winn also mailed to petitioners an Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870-AD) along with an Explanation of Items (Form 886-A), explaining the items being adjusted. The last entry on the Form 886-A reads, "A Form 870-AD has been attached. This document accompany's [sic] the Form 906 Closing Agreements. The taxpayer's [sic] signature is needed." The closing agreement is a three-page typed document, and it is not set forth on a printed Form 906. The closing agreement contains four signature lines that are relevant to this case. There is a signature line for each of the taxpayers, taxpayers' representative, and respondent's representative. Petitioners executed the closing agreement on May 16, 1989, and Nipper executed the closing agreement on *276 May 18, 1989. Respondent never executed the closing agreement. Petitioners did not execute the Form 870-AD. Clark hand delivered the signed closing agreement to Agent Winn on May 19, 1989. In August 1989, Agent Winn informed Clark that the various matters they discussed were not concluded, and that the case would be written up as unagreed because there remained unsettled issues and the Form 870-AD had not been signed by petitioners. On September 14, 1989, respondent issued a revenue agent's report disallowing all deductions and credits associated with International Recovery. In September 1990, respondent's Appeals Officer, John C. Matejka, Jr. (Matejka), began working on petitioners' case and met with petitioners' representative in November 1990. In a letter dated January 8, 1991, Matejka submitted to Nipper an audit statement and a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870) and requested that Nipper return the signed Form 870 as soon as possible. The audit statement contained calculations relevant to International Recovery. Matejka never received the Form 870 from Nipper or petitioners. In a letter *277 dated February 11, 1991, Matejka sent Nipper another Form 870 and the supporting computations. In that February 11, 1991, letter Matejka stated: It was my impression at the end of our conference that, though we had reached no agreement upon the question of whether the Steffler's commodity trading activities could be characterized for income tax purposes as the conduct of a trade or business, your client would agree to concede the * * * tax shelter issues and would petition concerning the commodity trader business issues as soon as I could arrange for issuance of the Statutory Notice of Deficiency. I have prepared the enclosed Form 870 to dispose of these tax shelter issues. The enclosed Form 3610 and its 16 attached pages demonstrates the computations of the deficiencies shown on the Form 870 enclosed. * * * Please, carefully reappraise the commodity trader issue. I sincerely would hate to see the Stefflers have to bear the emotional stress and economic cost of pursuing said issue as I strongly feel they have no acknowledgeable prospect of prevailing. On March 7, I plan to take the steps necessary to arrange for issuance of a Statutory Notice of Deficiency concerning any *278 issues which remain unagreed at that time. If I must do that, I hope that we have separately disposed of the tax shelter issues. Both the Government and the taxpayer incur unnecessary expense when a Notice is issued and a Petition is filed which references issues that are not in fact in dispute. So, please, execute the Form 870 if the International Recovery * * * issues can be resolved at this time.
Matejka never received the executed Form 870 from Nipper or petitioners. In a letter dated February 13, 1991, Clark responded to Matejka's letter of February 11, 1991. In his letter dated February 13, 1991, Clark discussed whether petitioner was a commodities trader, but Clark did not discuss the International Recovery issues. In a letter dated February 14, 1991, to Nipper, Matejka requested that petitioners execute a Special Consent to Extend the Time to Assess Tax (Form 872-A). The following is handwritten at the bottom of that letter: Mr. Nipper, We will need this if the tax shelter issues are to be settled before SND is issued and, I presume, petition filed on the commodity trader business issue.
Thanks, JM Petitioners executed the Form 872-A on February 15, *279 1991. In a letter to Matejka dated March 14, 1991, Clark proposed, among other things, that petitioners immediately pay respondent $ 10,722 "in full and final payment of the amount of money owed" by petitioners. Matejka rejected Clark's proposal in a letter dated March 21, 1991, and informed Clark -- If you are still interested in settling the tax shelter issues prior to issuance of the Statutory Notice of Deficiency, I would request that you send to me a copy of the computations which are the foundation of the $ 10,722 settlement offer which you conveyed in your letter of March 14.
Clark explained the $ 10,722 calculation in a letter dated April 18, 1991. Respondent issued a notice of deficiency dated April 30, 1991. On June 29, 1992, this Court filed its opinion in Hodges v. Commissioner, T.C. Memo. 1992-370, affd. in part, revd. in part, and remanded without published opinion 40 F.3d 1246 (9th Cir. 1994), which held that the International Recovery mining transactions were a sham and would not be recognized for Federal income tax purposes. Pursuant to that opinion, on June 17, 1993, this Court granted respondent's *280 Motion for Partial Summary Judgment as to the International Recovery issue, and petitioners preserved their right to raise the issue of whether the parties reached a valid settlement agreement. Trader or Investor in Commodities
Petitioner received his bachelor's degree in business administration from the University of Houston in 1946, and was in the construction business prior to 1982. Mrs. Steffler is a math teacher with a bachelor's degree in mathematics. In 1982, petitioner left the construction business and moved to a home he owned in Galveston, Texas. While in Galveston, petitioner started looking for "something to keep * * * [him] busy and earn some money with." Petitioner became interested in commodities and studied the commodities markets. Petitioner had no prior education or training in buying or selling commodities, and describes himself as "self-taught". Petitioner purchased stationery and business cards and opened a separate bank account under the name Steffler Enterprises. Petitioner conducted no other activities through Steffler Enterprises. Petitioner purchased a computer and, with the help of Mrs. Steffler, wrote computer programs to analyze data relevant *281 to the commodities markets. Petitioners had no prior training or education in computer programming. Petitioner purchased 10 years of commodity market data to use in his computer program in addition to entering the daily high, low, and close for the commodities that he tracked. Petitioner opened an account with Lind-Waldock & Co. in Chicago, Illinois, and that firm executed petitioner's orders. Petitioner had approximately $ 100,000 of capital available for his commodities activities. Petitioner did not use the services of an investment adviser to decide what commodities to purchase or when to buy or sell; instead, he relied entirely on his computer analysis for investment decisions. Petitioner implemented his investment strategy by choosing 16 "basic" commodities. After analyzing the market data on these 16 commodities, petitioner eliminated seven or eight of them as not suitable investments. Petitioner would run a daily computer analysis on the commodities that he followed. Petitioner purchased the following commodities contracts: [1]
Trade
Delivery Date
Position
Date Contracts
Commodity 10/21/85
long
Jan. 1986
2
2x4 lumber
11/06/85
short
Jan. 1986
2
2x4 lumber
11/18/85
long
Jan. 1986
3
2x4 lumber
12/06/85
long
Jan. 1986
2
2x4 lumber
12/18/85
short
Jan. 1986
5
2x4 lumber
05/23/86
short
July 1986
2
pork bellies
06/10/86
long
July 1986
2
pork bellies
09/11/86
long
Mar. 1987
3
sugar
09/23/86
short
Feb. 1987
1
hogs
10/09/86
long
Feb. 1987
1
hogs
10/30/86
short
Mar. 1987
3
sugar
12/04/86
long
July 1987
3
soybean oil
12/11/86
long
July 1987
3
soybean oil
01/28/87
short
July 1987
6
soybean oil
03/31/87
short
July 1987
2
2x4 lumber
04/01/87
short
July 1987
2
2x4 lumber
04/01/87
long
July 1987
5
soybean oil
04/21/87
long
July 1987
4
2x4 lumber
04/21/87
short
July 1987
5
soybean oil
05/12/87
long
Feb. 1988
1
pork bellies
05/13/87
short
Feb. 1988
1
pork bellies
05/21/87
short
Oct. 1987
3
sugar
05/27/87
short
Oct. 1987
2
sugar
06/15/87
long
Oct. 1987
5
sugar
06/17/87
short
Sept. 1987
2
2x4 lumber
06/18/87
short
Sept. 1987
2
2x4 lumber
08/06/87
long
Sept. 1987
4
2x4 lumber
*282 Petitioner did not take delivery on any of the contracts. Petitioner committed 40-60 hours per week to his commodities activities, and he did not pursue any other business activities during this time. Petitioners reported on Schedule C business losses of $ 5,097 in 1985, $ 11,489 in 1986, and $ 14,961 in 1987 from their commodities activities. Petitioners calculated net operating losses of $ 57,841 in 1985, $ 48,419 in 1986, and $ 9,702 in 1987. Petitioners filed amended returns for 1982, 1983, and 1984 carrying back losses incurred in 1985 to 1982 and 1983, carrying back losses incurred in 1986 to 1983 and 1984, and carrying back losses incurred in 1987 to 1984. Respondent disallowed petitioners' claimed Schedule C expenses for 1985, 1986, and 1987. After these and other adjustments, respondent determined that petitioners had no net operating losses in 1985, 1986, *283 or 1987, and respondent disallowed the net operating loss deductions on the 1982, 1983, and 1984 amended income tax returns. OPINION Settlement of the International Recovery Issues
Respondent disallowed a $ 25,000 deduction on Schedule C of petitioners' 1983 Federal income tax return described as a mining and development expense associated with International Recovery. Respondent argues that settlement offers were made to petitioners, but that petitioners did not accept those offers. Petitioners argue that they are entitled to a $ 10,000 ordinary loss deduction in 1983 pursuant to a settlement agreement reached between the parties, or in the alternative, that respondent is estopped from denying that such an agreement exists. Petitioners bear the burden of proving that respondent's determination is not correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). General contract law principles govern tax case settlements. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969); Smith v. Commissioner, T.C. Memo. 1991-412. A tax settlement agreement may be binding *284 even if it consists only of letters of offer and acceptance. Treaty Pines Invs. Partnership v. Commissioner, 967 F.2d 206, 211 (5th Cir. 1992), revg. and remanding an unreported Tax Court decision. Mutual assent is a prerequisite to the formation of a contract. 1 Corbin on Contracts, sec. 4.13 (rev. ed. 1993). Expression of assent that changes the terms of the offer in any material respect is not an acceptance, but may be operative as a counteroffer. Id. at sec. 3.28. A counteroffer terminates the power of acceptance of the original offer. Id. at sec. 3.35. McKenzie proposed a settlement to petitioners, but petitioners did not accept the proposal. When petitioners assented to respondent's proposal "subject to" the favorable resolution of other items, they rejected respondent's offer and made a counteroffer. Respondent never accepted petitioners' counteroffer. Petitioners' case was then transferred to Agent Winn. Agent Winn proposed to settle the International Recovery issues and mailed petitioners a closing agreement, a Form 870-AD, and a Form 886-A explaining the items being adjusted. Petitioners did not sign the Form 870-AD, but *285 they did sign and return the closing agreement. Petitioners argue that by signing and returning the closing agreement, they accepted respondent's offer contained therein. Respondent argues that petitioners did not accept the offer because the offer consisted of the closing agreement and the Form 870-AD, and petitioners did not sign the Form 870-AD. Nothing in the record indicates that a piecemeal resolution of the International Recovery issues was contemplated by either party. Clark testified that he met with Swift, and Agent Winn. Agent Winn testified that the closing agreement and the Form 870-AD were one package and that there was no settlement if petitioners signed the closing agreement but not the Form 870-AD. Swift testified that she also considered the closing agreement and the Form 870-AD one package. We found the testimony given by Swift, and Agent Winn, to be consistent and credible. Clark, a certified public accountant for over 16 years, testified he was not aware that respondent would return a copy of a closing agreement to the taxpayer after it had been executed by respondent. Clark also testified that he personally returned the signed closing agreement to McKenzie *286 on May 19, 1989; however, Swift noted that this was impossible since McKenzie passed away in October 1988. Thus, we are less certain that Clark recalls the events surrounding this case. In light of the negotiations that took place between Clark, Swift, and Agent Winn, in addition to the documents that were exchanged, we conclude that the parties understood that respondent's offer consisted of the closing agreement and the Form 870-AD. Petitioners' assent to a portion of respondent's offer by signing the closing agreement and not signing the Form 870-AD resulted in a counteroffer to respondent. Respondent could have accepted petitioners' counteroffer by signing the closing agreement, but this respondent did not do. Respondent never signed the closing agreement. We conclude that Agent Winn's offer consisted of the closing agreement and the Form 870-AD, and petitioners did not accept the offer made by Agent Winn. Petitioners do not argue that they reached an agreement with Matejka. Petitioners argue, in the alternative, that respondent is equitably estopped from denying that the parties reached a settlement agreement. Petitioners argue that they signed and returned the closing *287 documents and that they did not learn until after they filed their petition that respondent considered the matter unresolved. Petitioners bear the burden of proving the following elements to successfully invoke estoppel: (1) There must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; and (4) he must be adversely affected by the acts or statements of the person against whom an estoppel is claimed. * * *
Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); see Keado v. United States, 853 F.2d 1209, 1217-1218 (5th Cir. 1988). Petitioners have not shown any misrepresentations by respondent's representatives, and our review of the entire record reveals none. Petitioners' argument contains virtually no factual analysis. We conclude that petitioners have failed to establish any false representation or misleading silence. We also conclude that petitioners have failed to establish that they were ignorant of the facts. The *288 communications between petitioners and Matejka reveal that Matejka did not indicate that the closing agreement had been signed. To the contrary, Matejka's communications with petitioners indicate that the International Recovery issues remained unresolved. Clark testified that after receiving Matejka's letter dated February 11, 1991, he believed that the International Recovery issues had been settled. However, the February 11, 1991, letter from Matejka, the relevant portions of which are set forth above, should have alerted Clark and petitioners that the International Recovery issues remained unresolved. Clark testified that it was his "understanding" that the closing documents were "accepted" by respondent. Clark did not state the facts from which he drew these conclusions. We also note that a closing agreement signed by the taxpayer constitutes an offer to agree, and execution on behalf of the Commissioner constitutes acceptance of the taxpayer's offer. See Smith v. Commissioner, T.C. Memo. 1991-412; Rev. Proc. 68-16, sec. 6.07, 1968-1 C.B. 770, 780. We hold that equitable estoppel is not *289 an appropriate remedy in this case. We conclude that the parties did not enter into an agreement that disposed of the International Recovery issues. Trader or Investor in Commodities
Respondent determined that petitioners' commodities transactions do not constitute a trade or business, and the losses therefrom are properly reported on Schedule D. Petitioners argue that their commodities trading constitutes a trade or business, and losses therefrom were properly reported on Schedule C. We agree with respondent. A commodities contract is a commitment to receive or deliver a specified quantity of a commodity during a specified month in the future at a designated price. Each contract is called a "position". A position is "long" if the contract requires the holder to receive the commodity and "short" if the contract requires the holder to deliver the commodity. A position may be offset by acquiring an equal and opposite position to the position previously held. King v. Commissioner, 89 T.C. 445, 458 (1987). Petitioners offset each of their positions. In order to be engaged in carrying on a trade or business, the taxpayer must be involved *290 in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Juda v. Commissioner, 90 T.C. 1263, 1287 (1988), affd. 877 F.2d 1075 (1st Cir. 1989). In determining whether a taxpayer purchasing and selling securities is engaged in a trade or business, a distinction is drawn between a dealer, a trader, and an investor. The only issue before us is whether petitioner is a trader (one dealing on his own account in securities or commodity futures) who is considered to be engaged in a trade or business or an investor who is not. Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983); Paoli v. Commissioner, T.C. Memo. 1991-351. To qualify as a trader engaged in a trade or business, a taxpayer's activities must be frequent, regular, and continuous. Commissioner v. Groetzinger, supra at 35. Activities that are sporadic, in the sense that they are not regular and continuous, *291 do not qualify as a trade or business. Polakis v. Commissioner, 91 T.C. 660, 670-672 (1988). A trader engaged in a trade or business must undertake frequent and substantial trading, must seek profit from short term market swings, and receive income principally from trading rather than from dividends, interest, or long-term appreciation. Commissioner v. Groetzinger, supra; Moller v. United States, supra at 813; Purvis v. Commissioner, 530 F.2d 1332, 1334 (9th Cir. 1976), affg. per curiam T.C. Memo. 1974-164. An investor, on the other hand, is never considered to be engaged in a trade or business. The management of one's own investments is not considered a trade or business no matter how extensive or substantial the investment activities might be. Higgins v. Commissioner, 312 U.S. 212, 216 (1941); King v. Commissioner, supra at 458. Whether petitioners are engaged in a trade or business is a question of fact. Estate of Yaeger, v. Commissioner, T.C. Memo. 1988-264, *292 revd. on another issue, affd. in part, and remanded 889 F.2d 29 (2d Cir. 1989). Petitioners bear the burden of proving that their commodities activities constitute a trade or business. Mayer v. Commissioner, T.C. Memo. 1994-209, Estate of Yaeger v. Commissioner, supra.
In Paoli v. Commissioner, supra, taxpayer maintained a private telephone line with a stock brokerage house and had frequent conversations with brokers. A machine in the taxpayer's home produced current stock prices, and he also obtained information from periodicals, from reports on companies, and directly from the companies themselves. The taxpayer consummated 326 securities sales during the year at issue involving approximately $ 9 million worth of stocks or options. Between January 12 and February 11, the taxpayer consummated 125 of the 326 sales of stocks made during the year. During January, February, March, and May, the taxpayers reported 233 sales, 71.47 percent of the total sales for the year. We concluded that taxpayers failed to prove that their pattern of buying and selling *293 stocks was sufficiently regular and continuous during the entire year to constitute a trade or business. Petitioners purchased 16 commodities contracts in 1985, 18 in 1986, and 44 in 1987. Petitioners offset each contract within 2 months of the purchase date. Petitioners purchased five different commodities: Hogs, lumber, pork bellies, sugar, soybean oil. Petitioners traded on 5 to 7 days of the calendar year in 1985, 8 days in 1986, and 12 days in 1987. Petitioner testified at length on the subjects he studied and incorporated into his market analysis. These include regression theory, Elliot Wave theory, momentum indicators, and moving averages. Petitioners received no investment advice from outside sources, and they knew very little about computers when they began their investment activities. Petitioner testified that he worked at his commodities activities 40-60 hours per week, every week for 3 years, and that he and Mrs. Steffler spent about 2,000 hours over a 2-year period developing the main components of the computer program. Petitioners spent a substantial amount of their time studying, programming, and revising their computerized investment strategy. However, the *294 number of commodities contracts purchased, the number of types of commodities that petitioners purchased, and the number of days that petitioners purchased or sold contracts leads us to conclude that petitioners were investors in commodities and not traders. While painstaking study and an arduous decision making process may have consumed much of petitioners' time, this does not carry petitioners' burden of showing that their activities on the commodities market constitute a trade or business. We conclude that petitioners have not shown that their commodities market activity was frequent, regular, and continuous enough to constitute a trade or business. Schedule C Option Losses for 1984, and Travel and Entertainment Expense for 1985
Petitioners make no mention of these issues on brief or reply brief. Thus, we conclude that petitioners have conceded these issues. See Money v. Commissioner, 89 T.C. 46, 48 (1987). Increased Interest
Respondent determined that petitioners are liable for increased interest under section 6621 with respect to the underpayments for their taxable years 1982 and 1983. Section 6621 provides for an increase in *295 the interest rate to 120 percent of the statutory rate on the underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Respondent argues that the portion of petitioners' underpayments attributable to International Recovery and to their commodities transactions was attributable to tax-motivated transactions subject to section 6621. Petitioners do not argue that section 6621 does not apply to the understatements attributable to International Recovery, and we conclude that petitioners have conceded that issue. Respondent argues that "petitioners' decision to claim their commodity investing was a trade or business was designed to avoid the limitations on net operating losses" and therefore qualifies as a tax-motivated transaction. Petitioners argue that they intended to make a profit in their commodities trades and that these transactions were not tax motivated. We conclude that petitioners intended to profit from their commodities investments, and these investments were not a sham. Section 6621 is inapplicable to the understatements attributable to petitioners' commodities investments. Additions to Tax for Negligence
Respondent determined *296 that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2) for their 1982, 1983, and 1984 tax years. Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment which is attributable to negligence. Negligence is defined as the lack of due care or the failure to do what a prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 937 (1985). Petitioners bear the burden of establishing that the negligence addition to tax does not apply. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Respondent argues that petitioners are bound by this Court's opinion in Hodges v. Commissioner, T.C. Memo. 1992-370, *297 where the taxpayers were held liable for an addition to tax for negligence. In the alternative, respondent argues that petitioners were negligent concerning their investment in International Recovery because they failed to take reasonable steps to verify the soundness of their mining investment. We conclude that the facts of this case demonstrate that petitioners were negligent as to that portion of the underpayments attributable to their International Recovery investment. Petitioners invested in International Recovery with little more than the assurance from their son, an accountant, that the mining operation was a "legitimate deal" and a "going concern". Neither petitioners nor their son have training in geology. Petitioners did not produce any evidence that they consulted experts in mining or geology. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380, revg. T.C. Memo. 1988-408, is misplaced. The court in Heasley held that the taxpayers reasonably relied on their advisers when they reviewed the investment materials with their financial adviser and had an accountant prepare their returns because they *298 did not know how to report their investment. As to petitioners' investment in International Recovery, petitioners merely relied on the representations of their son. There is no evidence that their son had reviewed the terms of petitioners' investment, nor is there any evidence that petitioners' son gave them any accounting advice. Respondent argues that petitioners were also negligent as to the underpayments attributable to their commodities investing that were reported on their 1982, 1983, and 1984 amended returns. Petitioners argue that they reported their commodities activities in good faith, that they reasonably relied on their accountants' advice, and that they made full disclosure on their returns. Petitioners testified that he prepared petitioners' 1979 through 1987 Federal income tax returns without assistance. Nipper prepared petitioners' amended returns for 1982, 1983, and 1984. We conclude that petitioners' position that they were engaged in a trade or business was reasonable under the facts of this case. Given the considerable time that petitioners committed to their commodities investments, prudent persons under similar circumstances could reasonably take the *299 position that their activities constituted a trade or business. We conclude that petitioners were not negligent, for purposes of section 6653(a)(2), as to that portion of the underpayments attributable to their commodities investments. To reflect the foregoing and the concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. Petitioner purchased offsetting positions (2 contracts) for hogs with a July 1985 delivery date but the record contains no specific trade dates.↩